**Felix BLONDIN, Petitioner–Appellant,**

v.

**Marthe DUBOIS, Respondent–Appellee.**

**No. 00–6066.**

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 2000.

Decided Jan. 4, 2001.

---

Sanford Hausler (Valerie S. Wolfman, Robert Arenstein, Linda Silberman, of counsel), New York, NY, for Petitioner–Appellant.

Barry D. Leiwant, Legal Aid Society, Federal Defender Division, New York, NY, for Respondent–Appellee.

Wendy H. Schwartz, Assistant United States Attorney (Mary Jo White, United States Attorney, Gideon A. Schor, Assistant United States Attorney, of counsel), Southern District of New York, New York, NY, for Amicus Curiae United States of America.

Clifton S. Elgarten (Bridget K. Allison, of counsel), New York, NY, for Amicus Curiae National Organization for Women Legal Defense and Education Fund.

Before FEINBERG, CABRANES, and PARKER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

The question presented is whether the United States District Court for the Southern District of New York (Denny Chin, *Judge*) properly found that repatriation to France under any circumstances would subject two children who were abducted by their mother to post-traumatic stress disorder and, therefore, whether the Court correctly refused to repatriate them—as would ordinarily be required under the Hague Convention on the Civil Aspects of International Child Abduction—by applying the "grave risk of psychological harm" exception to the general rule of repatriation set forth in that treaty. *See* Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 13(b) ("grave risk" exception), T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10498 (the "Hague Convention" or "Convention"); 42 U.S.C. §§ 11601 *et seq.* (domestic implementing legislation).

I.

This is the second appeal in this case. The facts of this dispute are set forth fully in the District Court's first opinion, *see Blondin v. Dubois*, 19 F.Supp.2d 123, 124–26 (S.D.N.Y.1998) ("*Blondin I*"), and in our opinion in the first appeal, *see Blondin v. Dubois*, 189 F.3d 240, 242–44 (2d Cir. 1999) ("*Blondin II*"). We assume familiarity with those opinions and now describe

only the facts necessary to the disposition of the instant appeal.

Marthe Dubois and Felix Blondin lived together between 1990 and 1997 and had two children, Marie Eline and François. Dubois also had a son from a previous relationship, Crispin, who lived with her and Blondin during some portion of this seven-year period. Dubois claims that Blondin abused her and their children throughout the time they lived together. Before François's birth, Dubois allegedly left the house twice as a result of Blondin's physical and emotional abuse, taking Marie–Eline and Crispin with her. On one of those occasions, Dubois and her daughter spent eight or nine months in a battered women's shelter, while Crispin lived in a youth shelter. Both times, Dubois and Blondin reconciled, but both times, Blondin assertedly resumed his violent abuse.

In August 1997, when Marie–Eline was six years old and François two, Dubois abducted the children and came to the United States. In doing so, Dubois forged Blondin's signature on a passport application. When Blondin learned that Dubois and the children were living in the United States with Dubois's brother and his family, he instituted proceedings in the District Court seeking the return of the children to France under the Hague Convention.

The Convention requires the repatriation of an abducted child to its country of "habitual residence" in all but four exceptional circumstances. See Hague Convention, preamble; 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."); see also Blondin II, 189 F.3d at 245 (describing the four exceptions). In response to Blondin's petition, Dubois successfully invoked the Article 13(b) exception, which permits a judicial or administrative authority to refuse to order the repatriation of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b); see also Blondin I, 19 F.Supp.2d at 127.

On appeal, we vacated the judgment of the District Court and remanded the cause for further proceedings. See Blondin II, 189 F.3d at 249. We did not question the Court's findings regarding Blondin's history of abuse, and we declined to disturb its decision not to repatriate the children under circumstances that, for lack of another alternative, might force them and Dubois to live with Blondin.[1] See id. at 247. However, because the aim of the Convention is to ensure the "prompt return" of abducted children, see Hague Convention, preamble, we held that further proceedings were required in order to determine whether any arrangements might be made that would mitigate the risk of harm to the children, thereby enabling them safely to return to France. See id. at 248. Specifically, we stated that "it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." Id.

On remand, the District Court found that if Dubois and the children returned to France, they would be eligible for social services, and Dubois would receive free legal assistance in the pending custody proceedings; that Blondin would assist her and the children financially in moving back to France, and would agree not to attempt to make contact with them prior to the judicial determination of custodial rights; and that the French government would not

---

1. Although the Convention deals with the repatriation of abducted children, it is apparent from the District Court's opinion and the parties' submissions to this Court that no one contemplates the return of the children to France without the accompaniment of Dubois.

prosecute Dubois for the abduction or the forgery. *See Blondin v. Dubois*, 78 F.Supp.2d 283, 288–93 (S.D.N.Y.2000) (*"Blondin III"*). However, the District Court found, on the basis of the evidence presented, that even these arrangements—indeed, that *any* arrangements at all—would fail to mitigate the grave risk of harm to the children, because returning to France under *any* circumstances would cause them psychological harm, as France was the scene of their trauma. *See id.* at 297. The Court based this determination on uncontested expert testimony that the children would suffer from post-traumatic stress disorder upon repatriation. *See id.*

Blondin timely filed this appeal on January 19, 2000.

## II.

The aim of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *See* Hague Convention, preamble; *see also Blondin II*, 189 F.3d at 244–45. As we explained in more detail in *Blondin II*, a "wrongful removal" under the Convention is one "in breach of rights of custody . . . under the law of the State in which the child was habitually resident." Hague Convention, art. 3; *see also Blondin II*, 189 F.3d at 245. If the removal was wrongful, "the child must be returned unless the defendant can establish one of four defenses." *Blondin II*, 189 F.3d at 245 (internal quotation marks omitted); *see also* 42 U.S.C. § 11601(a)(4). No one disputes that Dubois's removal of the children was "wrong-

ful" within the meaning of the Convention. Rather, the parties disagree as to whether Dubois has established a defense under the Convention.

Dubois originally sought to make out a defense only under Article 13(b), pursuant to which a court may decline to repatriate a child if the party opposing repatriation establishes by clear and convincing evidence that repatriation would create a grave risk of physical or psychological harm to the child.[2] *See* Hague Convention, art. 13(b); *Blondin II*, 189 F.3d at 245. It was this matter that the District Court considered in *Blondin I*, and that we reviewed in *Blondin II*. However, following our decision in *Blondin II*, Dubois asked the District Court to expand its inquiry specifically to take into account "whether Marie–Eline had become *so deeply rooted* in the United States that returning her to France would expose her to a grave risk of psychological harm, arguing that the Second Circuit had left this issue open to consideration on remand." *Blondin III*, 78 F.Supp.2d at 287 (emphasis added). Ordinarily, the issue of whether a child is "settled" in a new environment arises under Article 12 of the Convention, which applies only if the petitioning parent commences proceedings more than one year after the abduction. *See* Hague Convention, art. 12.[3] Because Blondin filed his petition within a year, Article 12 does not apply in this case. Expressly recognizing this, the District Court nevertheless granted Dubois's request and took into account whether both children were settled in their new environment as one factor in its "grave risk"

**2.** Article 13(b) provides, in relevant part:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—

. . .

(b) there is a grave risk that his or her return would expose the child to physical or

psychological harm or otherwise place the child in an intolerable situation.

**3.** The relevant portion of Article 12 provides:

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

analysis under Article 13(b). *See Blondin III*, 78 F.Supp.2d at 287–88.

In addition, the District Court considered Marie–Eline's objections to returning to France. Like the "settled" exception of Article 12, the child's views on repatriation ordinarily arise under another provision of the Hague Convention—in this case, an unnumbered provision of Article 13.[4] The District Court, however, decided to consider Marie–Eline's views, as yet another factor in the "grave risk" analysis under Article 13(b). *See id.* at 296.

Blondin challenges the conclusion that repatriation would create a grave risk of psychological harm within the meaning of Article 13(b), and objects to the District Court's consideration, as part of its "grave risk" analysis, of whether Marie–Eline is settled in her new environment and whether she objects to returning to France. We consider these matters in turn.

### A.

Before proceeding to the merits of this case, we consider the applicable standard of review. Only recently we stated that "[t]he proper interpretation of the Hague Convention is an issue of law, which we review de novo." *Croll v. Croll,* 229 F.3d 133, 136 (2d Cir.2000). In cases arising under the Convention, a district court's factual determinations are reviewed for clear error. *See Walsh v. Walsh,* 221 F.3d 204, 214 (1st Cir.2000); *Shalit v. Coppe,* 182 F.3d 1124, 1127 (9th Cir.1999); *Lops v. Lops,* 140 F.3d 927, 935 (11th Cir.1998); *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996). The District Court's *application* of the Convention to the facts it has found, like the *interpretation* of the Con-

vention, is subject to de novo review. *See Feder v. Evans–Feder,* 63 F.3d 217, 222 n. 9 (3d Cir.1995) (holding that de novo review applies to "the [district] court's choice of legal precepts *and its application of those precepts to the facts*") (emphasis added); *cf. Cree v. Flores,* 157 F.3d 762, 768 (9th Cir.1998) ("We review de novo the interpretation and application of treaty language. Underlying factual findings, including findings of historical fact, are reviewed for clear error.") (citations omitted).

Accordingly, in this case we review for clear error the District Court's factual findings that the children will suffer a recurrence of "acute, severe traumatic stress disorder" if they return to France, in part because they are settled in an environment in which they are recovering from their previous trauma; that Marie–Eline objects to returning to France; and that Marie–Eline was old enough and mature enough at eight years of age for her views to be considered.[5] We review de novo the Court's conclusion that a likelihood of post-traumatic stress disorder constitutes a "grave risk of psychological harm" within the meaning of Article 13(b), and its decision to consider both whether the children were "settled" in their new environment, and whether Marie–Eline objected to returning to France, as individual factors in a broader "grave risk" analysis under Article 13(b).

### B.

On remand from *Blondin II,* the District Court inquired into what arrangements might be made in order to make possible the children's return without subjecting them to a grave risk of psychologi-

---

4. This unnumbered provision in Article 13 provides:

> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

5. The District Court made other factual findings which are not in dispute—namely, that Dubois would be eligible for social services that would enable her and the children to live apart from Blondin while the French courts resolved the custody dispute, and that both Blondin and the French authorities are willing and able to take steps toward reducing the risk of harm associated with repatriation.

cal harm. *See Blondin III*, 78 F.Supp.2d at 285–91. The Court heard the testimony of Veronique Chauveau, an expert on French family law and international law, concerning the social and legal support services that would be available to Dubois and her children if they were to return to France;[6] received letters on the same matter from the French Ministry of Justice, which acts as the French Central Authority under the Convention;[7] and heard from Dr. Albert J. Solnit, an expert in child psychiatry and pediatrics and Sterling professor emeritus at Yale University. *See id.* at 285.

Chauveau's testimony and the submissions of French authorities established that, on arrival in France, Dubois could seek a modification of a pending order by a French court granting Dubois and Blondin joint custody of the children and fixing their principal residence with Blondin. *See id.* at 288. Such a modification, which could take up to three months to obtain, would fix the "habitual residence" of the children with Dubois pending an evaluation and a new custody hearing. *See id.* In addition, the French Ministry of Justice would arrange for Dubois to receive free legal services should she choose to seek modification of the order. *See id.* at 289.

Blondin himself offered to make several undertakings in order to mitigate the risks associated with repatriation.[8] He agreed to pay for the airfare and a three-week stay at a "one-star" hotel for Dubois and the children while Dubois applied for social services, and agreed not to attempt to enforce the existing custody order while renewed custody proceedings were pending. *See id.* According to Chauveau, a French court would enforce these undertakings by Blondin provided they are "not contrary to the public policy of France." *Id.* (internal quotation marks omitted). In addition, the Office of the Prosecutor in Bobigny, where Dubois resided before she

6. Chauveau was presented as a witness by *amicus curiae* the United States, which supports Blondin's position. The United States submitted a statement of interest pursuant to 28 U.S.C. § 517, which provides:

> The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.

7. The Convention provides that "[a] Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention on such authorities." Hague Convention, art. 6. The French Ministry of Justice acts as France's Central Authority, *see Blondin III*, 78 F.Supp.2d at 287, while the Department of State acts as the Central Authority for the United States, *see* Exec. Order No. 12,648, 53 Fed.Reg. 30637 (Aug. 11, 1988), reprinted in 42 U.S.C. § 11606. Pursuant to our advice "to make any appropriate or necessary inquiries of the government of France," *Blondin II*, 189 F.3d at 249, the District Court contacted both the French Ministry of Justice and the United States Department of State. *Blondin III*, 78 F.Supp.2d at 287. The United States Attorney for the Southern District of New York, representing the Department of State, forwarded to the District Court the responses of the French Ministry of Justice. *See id.* at 288.

8. Although the Hague Convention does not use the term "undertaking," in cases under the Convention courts use the term "undertaking" to refer to a promise by the petitioning parent "to alleviate specific dangers that might otherwise justify denial of the return petition. Typical undertakings concern support, housing and the child's care pending resolution of the custody contest." Carol S. Bruch, *The Central Authority's Role Under the Hague Child Abduction Convention: A Friend in Deed*, 28 Fam. L.Q. 35, 52 n. 41 (1994) (explaining use of undertakings by British courts). *See also* Symposium, *Women, Children and Domestic Violence: Current Tensions and Emerging Issues*, remarks by Linda Garder, 27 Fordham Urb. L.J. 567, 757 (2000) (noting increasing use of undertakings by United States courts); *Walsh*, 221 F.3d at 219 ("The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction."); *Croll*, 229 F.3d at 135 n. 1; *Feder*, 63 F.3d at 226.

left for the United States, agreed not to prosecute Dubois for the abduction or the forgery of the passport documents. *See id.*

Finally, the District Court also accepted Dr. Solnit's conclusions—which, as the only expert testimony presented on the risk of psychological harm to the children, stand uncontroverted. *See id.* at 290; *see also* Letter to the Honorable Denny Chin from Albert J. Solnit, M.D. and Barbara Nordhaus, MSW, LCSW (Dec. 16, 1999) ("Solnit Report"). Dr. Solnit interviewed Dubois, Marie–Eline, and François, and examined the following documents: the opinions in *Blondin I* and *Blondin II;* the District Court's order dated October 28, 1999 determining that the "settled" exception could be considered as one factor in the "grave risk" analysis (the "October 1999 Order"); and the transcript of Blondin's testimony at a hearing held on June 28, 1999. *See Blondin III,* 78 F.Supp.2d at 290; *see also* Solnit Report at 3.

Dr. Solnit concluded that Marie–Eline and François were "recovering from the sustained, repeated traumatic state created in France by their father's physically and emotionally abusive treatment" and that "if the children were returned to France with or without their mother and even if they could avoid being in the same domicile as their father [ ] they would almost certainly suffer a recurrence of their traumatic stress disorder (i.e. post-traumatic stress disorder) that would impair their physical, emotional, intellectual and social development." Solnit Report at

4, 6. He explained further that such a recurrence "would set them back in a very harmful way as they are still recovering from the trauma they had been suffering from until two and a half years ago. Such a move would undo the benefit of the psychological and emotional roots they have established with their mother and her extended family, which has resulted in the beginning of a full recovery from their severe trauma in France." *Id.* at 6–7.[9]

Blondin did not present any evidence as to the psychological impact that a return to France would have on the children. We are thus presented with a rare situation in which, for unexplained reasons, no evidence was presented by one party that would contradict the conclusions of an expert procured by the opposing party. Dr. Solnit's conclusions thus stand uncontroverted. They are the only evidence that we and the District Court have available as to whether repatriation to France would cause the children to suffer a recurrence of traumatic stress disorder.

After hearing Dr. Solnit's testimony and reviewing his report, the District Court found, "by clear and convincing evidence, that return of Marie–Eline and François to France, under any arrangement, would present a 'grave risk' that they would be exposed to 'physical or psychological harm' or that they would otherwise be placed in an 'intolerable situation.'" *Blondin III,* 78 F.Supp.2d at 283. In addition, the Court found that, although it might be possible to place Dubois and the children with a third party or to provide them with subsidized

9. In his in-court testimony, Dr. Solnit acknowledged "that clear manifestations of traumatic stress disorder did not emerge in his interview with François because he would probably have been too young to remember it or be able to verbalize it." *Blondin III,* 78 F.Supp.2d at 291 n. 9 (paraphrasing testimony) (internal quotation marks omitted). With respect to this observation, the Court stated in footnote 9 of its opinion that although "François might not suffer the same degree of psychological trauma if he were to return to France, [the Court would] not separate the children." *See id.* Despite this finding that

the trauma suffered by François might be of a different "degree," both Dr. Solnit's report and the District Court's opinion clearly found that a risk of post-traumatic stress disorder existed with respect to *both* children. *See* Solnit Report at 6–7; *Blondin III,* 78 F.Supp.2d at 292–95. Reading footnote 9 in the context of the opinion as a whole, we understand it to mean that the risk of trauma with respect to François may be somewhat less than that which exists with respect to Marie–Eline, but that a grave risk of psychological harm exists for both of them.

housing and social services, thereby avoiding all contact with Blondin pending a resolution of custody issues, there is nevertheless nothing the French authorities could do to protect the children from the harm they face in this particular situation, because their mere presence in France, the site of their trauma, would create the risk. *See id.* at 295–96. In entering these findings, the Court noted that "Dr. Solnit is a widely recognized expert in child psychiatry and psychology" and that "[h]is books and articles have been cited hundreds of times in federal and state court cases, including by the Second Circuit." *Id.* at 290 n. 7.

In light of Dr. Solnit's qualifications and expertise, *see, e.g.,* J. GOLDSTEIN, A. FREUD, A. SOLNIT & S. GOLDSTEIN, IN THE BEST INTERESTS OF THE CHILD (1986); his examination of relevant documents; his interviews with Dubois and the children; and, we emphasize, the absence of any contravening evidence on point, we see no basis upon which to question the District Court's finding that the children will suffer from a recurrence of traumatic stress disorder if they return to France.

Blondin's evidence consisted entirely of testimony concerning the government services available to Dubois and the arrangements that Blondin and the French authorities would be willing to make to facilitate repatriation of the children. We do not underestimate the importance of this evidence, which we requested, and we appreciate the lengths to which both Blondin and the French authorities have gone to address the concerns raised by Dubois and by our courts. However, in light of the evidence presented by Dubois, Blondin's evidence is essentially inapposite, as it does not purport to cast doubt on the Court's finding that *even with all of these arrangements in place,* the children face an almost certain recurrence of traumatic stress disorder on returning to France because they associate France with their father's abuse and the trauma they suffered as a result. There-

fore, we cannot say that the District Court's conclusion was clearly erroneous, and we decline to disturb it.

■ Reviewing de novo the District Court's application of Article 13(b) to this factual determination, we affirm its decision to deny repatriation on the ground that a "grave risk of psychological harm" exists within the meaning of Article 13(b).

■ The Hague Convention is not designed to resolve underlying custody disputes. *See* Hague Convention, art. 19; *Blondin II,* 189 F.3d at 245. This fact, however, does not render irrelevant any countervailing interests the child might have. According to the Explanatory Report of the Convention,

> the dispositive part of the Convention contains no explicit reference to the interests of the child. . . . However, its silence on this point ought not to lead one to the conclusion that the Convention ignores the social paradigm which declares the necessity of considering the interests of children in regulating all the problems which concern them. On the contrary, right from the start the signatory States declare themselves to be firmly convinced that the interests of the children are of paramount importance in matters relating to their custody. . . .

Elisa Pérez–Vera, *Explanatory Report: Hague Conference on Private International Law,* in 3 Acts and Documents of the Fourteenth Session 426 (1980) ("the "Explanatory Report" or "Report"), ¶ 23; *see generally Blondin II,* 189 F.3d at 246 n .5 (explaining why the Report is an especially useful aid to interpretation of the Convention). As the Report explains, Article 13(b) "clearly derive[s] from a consideration of the interests of the child. . . . [T]he interest of the child in not being removed from its habitual residence . . . gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Explanatory Report at ¶ 29.

The United States Department of State's legal analysis of Article 13(b) provides the following example of an intolerable situation:

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

51 Fed.Reg. at 10510.[10] In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

The Sixth Circuit's analysis under Article 13(b) in *Friedrich* describes a similar spectrum. *See Friedrich*, 78 F.3d at 1068. The Sixth Circuit observed that "[t]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Id.* Instead, the Sixth Circuit indicated that a "grave risk" exists in only two situations: (1) where returning the child means sending him to "a zone of war, famine, or disease"; or (2) "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason*, may be incapable or unwilling to give the child adequate protection." *Friedrich*, 78 F.3d at 1069 (emphasis added).

The District Court found that the facts presented in this case belong on the latter end of the spectrum. *See Blondin III*, 78 F.Supp.2d at 298. The District Court did not deny repatriation on the basis of financial considerations, educational opportunities, the children's preferences, or other such advantages. Rather, the District Court based its decision on its findings of the serious abuse involved in this case and the resulting harm that the children would suffer on returning to France. *See id.* The District Court also found, with respect to this harm, that the authorities in France—for reasons entirely beyond their control—cannot provide the children with the necessary protection. *See id.* at 298–99. Clearly, the French authorities are both willing and able to make numerous arrangements and accommodations to facilitate repatriation. However, due to the particular circumstances presented here, they cannot provide the necessary protection because doing so would require them to fulfill the impossible task of ensuring that a return to France would not trigger a recurrence of traumatic stress disorder in the children. *Cf. Walsh*, 221 F.3d at 221 (holding that although the court had "no doubt that [courts of the home country] would issue appropriate protective orders," repatriation was denied in part because spouse's

---

10. We are mindful that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *see also* *United States v. Stuart*, 489 U.S. 353, 369, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989). Accordingly, we give great weight to the State Department's interpretation of the Convention. *See ante* at note 7 (explaining that the State Department is the "Central Authority" charged with administering the Convention).

habitual disobedience of such orders would render them ineffective).[11]

Since the District Court found—on the basis of uncontested expert testimony—that the children will face a recurrence of traumatic stress disorder if repatriated to France, and we have concluded that this finding is not clearly erroneous, we cannot say that Article 13(b) does not apply in this case. A "grave risk of psychological harm," even construed narrowly, undoubtedly encompasses an "almost certain[ ]" recurrence of traumatic stress disorder.[12] Therefore, the District Court properly applied Article 13(b) to the facts presented in this case. We affirm its decision.

### C.

The District Court granted Dubois's request that it consider whether Marie–Eline was "so deeply rooted in the United States that returning her to France would expose her to a grave risk of psychological harm." *Blondin III*, 78 F.Supp.2d at 287; *see also* October 1999 Order. The Court did not consider this matter under the rubric of Article 12 of the Hague Convention,[13] under which the issue of whether a child is "settled" usually arises, because that provision applies only if the petition was filed over one year after the abduction, whereas Blondin instituted these proceedings within 10 months of the abduction. *See Blondin III*, 78 F.Supp.2d at 287. Instead, the Court accepted Dubois's argument that the issue of whether a child is "settled" in its new environment may be considered as one of several factors in the "grave risk" analysis under Article 13(b). In support of this proposition, Dubois quotes our statement in *Blondin II*:

it must examine the full range of options that might make possible the safe return of a child to the home country. Second, we do not read *Friedrich* as narrowly as the District Court seems inclined to do. As we have explained, in the instant case we confront a situation involving allegations of serious abuse and in which the authorities, through no fault of their own, may not be able to give the children adequate protection. *See Friedrich*, 78 F.3d at 1069. Although the wording in *Friedrich* might seem somewhat narrow, we believe the facts in the case at bar fall within the second standard set forth in that opinion. *See id.* (noting that grave risk of harm exists "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason,* may be incapable or unwilling to give the child adequate protection") (emphasis added).

**11.** In its opinion, the District Court explicitly rejected what it described as the Sixth Circuit's "extremely narrow" interpretation of Article 13(b) in *Friedrich,* and noted in the course of doing so that we seemed to be leaning toward an equally "narrow" standard in *Blondin II* when we "implied that [the findings in *Blondin I*] were insufficient to establish a 'grave risk of harm' under Article 13b without an additional finding that no other options existed by which the children would be safely returned to France." *Blondin III*, 78 F.Supp.2d at 297. As the Court put it, "[t]he gloss placed on Article 13b by the Sixth Circuit—and seemingly adopted by the Second Circuit—is unwarranted and narrows the 'grave risk' exception to the point where it is virtually written out of the Convention." *Id.*

The District Court seems to have misunderstood our statement in *Blondin II*. In order to avoid further confusion, we make two observations: First, the requirement to which the District Court refers was stated clearly, not merely "implied," in *Blondin II. See* 189 F.3d at 249 (holding that the District Court must examine "the range of remedies that might allow both the return of the children to their home country and their protection from harm, pending a custody award in due course by a [court in the home country] with proper jurisdiction"). We reiterate this requirement here: In cases of serious abuse, before a court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b),

**12.** Our interpretation of Article 13(b) by no means implies that a court must refuse to send a child back to its home country in *any* case involving allegations of abuse, on the theory that a return to the home country poses a grave risk of psychological harm. Rather, we reach our conclusion on the basis of the specific facts presented in this case and, in particular, on the absence of testimony contradicting Dr. Solnit's conclusions.

**13.** *See ante* at note 3.

We do not rule out the possibility of a case in which a petition seeking a child's return is filed less than a year after the child's abduction, but it is nevertheless established by clear and convincing evidence on the child's behalf that he or she is so deeply rooted in the United States that there is a grave risk that [the child's] return would expose the child to ... psychological harm. The child might then be excepted from return under Article 13(b). The record as now constituted does not present such a case.

Appellee's Brief at 10 n. 5 (quoting *Blondin II*, 189 F.3d at 247–48). In *Blondin II*, we neither ruled out this possibility nor explored it in any detail. We now conclude, on the basis of an expanded record and additional findings of fact and conclusions of law by the District Court, that the Court properly considered whether the children were settled in their new environment as *one factor* in the Article 13(b) analysis.

As we read Article 12, it allows—but does not, of course, require—a judicial or administrative authority to refuse to order the repatriation of a child on the *sole* ground that the child is settled in its new environment, *if* more than one year has elapsed between the abduction and the petition for return. The article begins by setting forth the general rule that

> [w]here a child has been wrongfully removed or retained ... and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

Hague Convention, art. 12. It then carves out a simple exception:

> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, *unless it is demonstrated that the child is now settled in its new environment.*

*Id.* (emphasis added). In other words, if more than one year has passed, a "demonstra[tion] that the child is now settled in its new environment" may be a *sufficient* ground for refusing to order repatriation.

To the extent that Article 12 permits the courts of a party to the Convention to deny repatriation on this basis, it effectively allows them to reach the underlying custody dispute, a matter which is generally outside the scope of the Convention. *See* Explanatory Report at ¶ 107 ("[I]n so far as the return of the child is regarded as being in its interests, it is clear that after a child has become settled in its new environment, its return should take place only after an examination of the merits of the custody rights exercised over it—something which is outside the scope of the convention.") However, the Convention's framers recognized that although its aim is to ensure the return of abducted children without reaching the merits of underlying custody disputes, there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest. *See id.* Therefore, they settled on the one-year time limit, which, "although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard." *Id.*

None of this implies that the question of whether a child is settled may not be considered *at all* under Article 13(b); it simply means that this factor cannot be the *sole* reason for repatriation, except as provided by Article 12. Under Article 13(b), the fact that a child is settled may form part of a broader analysis of whether repatriation will create a grave risk of harm. The ordinary disruptions necessarily accompanying a move would not by themselves constitute such a risk. *See Walsh*, 221 F.3d at 220 n. 14 ("We disre-

gard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal."); *Friedrich*, 78 F.3d at 1068 (explaining that "adjustment problems that would attend the relocation of most children" are not sufficient to warrant a denial of repatriation under Article 13(b)). Yet in the course of an Article 13(b) analysis, a district court may be presented with evidence that a child is now settled in a new environment, and such evidence may be relevant to the issue of grave risk. As we suggested in *Blondin II*, 189 F.3d at 247–48, a district court may consider it as part of an analysis under Article 13(b) as long as that factor is not the sole basis for a finding that there is clear and convincing evidence that a grave risk of harm exists.[14]

The District Court in this case properly considered the evidence that the children were settled in their new environment as one factor in its grave risk analysis. The Court was careful to establish the connection between the fact that they were settled and the grave risk of harm the Court had found a return to France would create: "I am convinced that wrenching the children away from the safe, extended-family environment in which they have begun to recover from the trauma caused by their father's abuse would thwart their recovery *by causing a recurrence of the*

*traumatic stress disorder they suffered in France*, the site of their father's sustained, violent abuse." *Blondin III*, 78 F.Supp.2d at 295 (emphasis added). The District Court explicitly "rejected the argument [that it should consider whether they had become deeply rooted in the United States] to the extent that respondent was attempting to invoke the 'well-settled' exception set forth in Article 12 of the Convention," agreeing to consider it only "within the context of Article 13b." *Id.* at 287. Its discussion makes clear that the evidence that the children are well-settled in the United States was not, by itself, the dispositive factor in this case. Accordingly, we conclude that the Court did not err in considering this evidence as one factor in its Article 13(b) analysis.

### D.

■■■ In declining to order the return of the children, the District Court also took into account Marie–Eline's objections to returning to France. *See Blondin III*, 78 F.Supp.2d at 296. The Court was somewhat ambiguous as to the applicable provision in this regard. It initially cited the unnumbered provision of Article 13 that governs a court's consideration of a child's views,[15] but it subsequently explained that it was considering Marie–Eline's views as only one factor under its Article 13(b) analysis: "[H]er objection to being returned to

**14.** Petitioner's insistence that such evidence would be irrelevant in this case may explain why he did not present any evidence at all purporting to cast doubt on Dr. Solnit's conclusions. In a letter to Judge Chin opposing respondent's request that the District Court consider such evidence in the context of its "grave risk" analysis, counsel for petitioner wrote: "While the Second Circuit did not rule out the possibility that the fact that a child is well settled in his new location could be relevant if the child is so deeply rooted in the United States that the child's return would present a grave risk of physical or psychological harm to him or her, implicit in the dicta to that effect is that such would be an exceptional case." Letter to the Honorable Denny Chin from Valerie S. Wolfman (September 27, 1999). The problem with petitioner's reason-

ing is that respondent presented expert evidence precisely with the aim of proving that *this is the exceptional case*—that is, that the children are "so deeply rooted in the United States that there is a grave risk that [their] return would expose [them] to . . . psychological harm." *Blondin II*, 189 F.3d at 247–48. Once the District Court ruled that such evidence could be presented in the context of Article 13(b), *see* October 1999 Order, merely asserting that this is not the exceptional case would not suffice to contradict the expert proof that it is—and it would not give us any ground at all upon which to reject a finding based on such proof.

**15.** For the text of the provision, *see ante* at note 4.

France is simply one of several reasons [for] invoking Article 13(b) and refusing to send the children back." *Id.*

The unnumbered provision of Article 13 permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. According to the Explanatory Report, under this provision a child's objection may be conclusive:

> [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account.

Explanatory Report, ¶ 30. The Convention does not establish a minimum age at which a child is old enough and mature enough to trigger this provision; as explained in the Report, "all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary." *Id.* The Report itself, however, cites the example of a fifteen-year-old: "[T]he fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will." *Id.*

Blondin challenges the factual finding that at eight years old Marie–Eline was old enough for the Court to consider her views. The United States, in turn, objects to this portion of the Court's analysis on the ground that the unnumbered provision of Article 13 "does not contemplate a general airing of a child's 'views' as part of an Article 13(b) analysis of 'grave risk'; rather, it permits, although does not require, a court to refuse return based on the *separate* ground of an older child's maturely considered objection to return." Brief of *Amicus Curiae* United States at 23 (emphasis added). At the same time, the United States concedes that a court may consider the testimony of a younger child as part of the "grave risk" analysis—although, in its view, such testimony must be limited to "evidence that abuse has occurred or that return to the immediate custody of an abusive parent would pose a grave risk of harm." *Id.* at 27.

We agree with the government that the unnumbered provision of Article 13 provides a *separate* ground for repatriation and that, under this provision, a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child. We also agree with the government that a court may consider a younger child's testimony as part of a broader analysis under Article 13(b). In either case, of course, a court must take into account the child's age and degree of maturity in considering how much weight to give its views. As the government acknowledges, however, it stands to reason that the standard for considering a child's testimony *as one part of a broader analysis* under Article 13(b) would not be as strict as the standard for relying *solely* on a child's objections to deny repatriation under Article 13. *See* Brief of United States as *Amicus Curiae* at 27. Moreover, we do not find any basis in the Convention or in the relevant case law for limiting such testimony to "evidence that *abuse has occurred* or that return *to the immediate custody of an abusive parent* would pose a grave risk of harm." *Id.* (emphasis added). Rather, if a child's testimony is germane to the question of whether a grave risk of harm exists upon repatriation, a court may take it into account.

In the instant case, we conclude that the District Court properly considered Marie–Eline's views as part of its "grave risk" analysis under Article 13(b), and that it did not clearly err in finding that Marie–Eline was old and mature enough for her views to be considered in this context. However, because it is evident that the Court did not rely *solely* on her views in reaching its judgment, *see Blondin III,* 78 F.Supp.2d at 296, we do not reach the question of

whether she had attained an age and degree of maturity sufficient for her views to be *conclusive* pursuant to the unnumbered provision of Article 13. For the same reason, we do not reach the question of whether, if Marie–Eline's views had been the *sole* basis for a denial of repatriation, the objections she expressed would have been sufficient to support such a denial.

Both the District Court and Dr. Solnit interviewed Marie–Eline, on different occasions. Judge Chin interviewed the children together in his chambers without their mother present; he gave them toys to play with while they talked to him and he did not wear his judicial robe. *See id.* at 292–93 & n. 10. Dr. Solnit testified that he interviewed the children with a colleague, in a playroom, where they also played with toys. *See* 12/20/99 Transcript ("Tr.") at 60–61. In each of these sessions, Marie–Eline stated that she did not wish to return to France because she was afraid of her father, and she described various instances of abuse and its effects on her, including her father's spitting on and hitting her mother, at least once with a belt buckle; his putting something around Marie–Eline's neck and threatening to kill her; and Marie–Eline's own fear, nightmares, and inability to eat. *See* Tr. at 59, 61, 114. When asked by Judge Chin whether she would like to return to France if she did not have to live with her father, she replied that she would like to visit Paris for just "one day ... or so." *Id.* at 115.

On the basis of these interviews, the District Court found that "Marie–Eline objects to being returned to France," noting that she "explicitly stated that she does not want to return to France because she does not want to be subjected to further physical and emotional abuse at the hands of her father." *Blondin III*, 78 F.Supp.2d at 296. The Court also found that Marie–Eline is "a bright, poised, intelligent child who has an understanding of the purpose of these proceedings and who spoke thoughtfully and expressively about her

views on being returned to France," and that she is "a remarkably mature eight-year-old." *Id.* Although both Dr. Solnit and the Court could not rule out the possibility that Marie–Eline "may have been coached," *id.* at 293, 296, Dr. Solnit testified that he did not detect any training or rehearsal in her statements, *see id.* at 293, and the Court found that her objections to returning to France were not "the product of the abductor parent's undue influence," *id.* at 296 (internal quotation marks omitted).

Blondin does not argue that Marie–Eline is immature for her age; rather, he simply questions whether any eight-year-old is old enough for its views to be considered, and he observes that she is not as mature as a 12–or 13–year–old. This argument lacks merit. To accept it we would have to conclude that under the Convention, as a matter of law, an eight-year-old is too young for her views to be taken into account. We decline to do so, as this would read into the Convention an age limit that its own framers were unwilling to articulate as a general rule. *See* Explanatory Report, ¶ 30.

Blondin also questions whether Marie–Eline truly objects to returning to France, as opposed to returning to live with her father specifically. This argument has some merit: In both conversations, Marie–Eline several times distinguished between returning to France itself and returning to live with her father, and objected specifically to the latter. 12/20/99 Tr. at 59, 108, 114. Nevertheless, although we doubt that the objections expressed by Marie–Eline would be sufficient, without more, to sustain the judgment in this case, we cannot say that the District Court clearly erred in finding that she objects to returning to France. This finding, relying as it (in part) did on the Court's personal observations of Marie–Eline, is of the sort "peculiarly within the province of the trier of fact and is entitled to considerable deference." *See Mackler Productions v. Cohen*, 225 F.3d 136, 145 (2d Cir.2000) (ex-

**168**

plaining that assessment of witnesses' credibility is peculiarly within province of district court); *United States v. Thai,* 29 F.3d 785, 810 (2d Cir.1994) (noting district court's "unique ability to observe the witnesses" in affirming court's decision that six-year-old was competent to testify). Therefore, we decline to disturb it.

Accordingly, we conclude that the District Court did not clearly err in finding that Marie–Eline was old enough and mature enough for her views to be taken into account, and that it properly considered them as one factor in a broader "grave risk" analysis under Article 13(b).

### III.

For the reasons stated above, we conclude that, in the particular and unusual circumstances presented in this case—in which the only expert testimony in the record supports the District Court's conclusions and judgment:

(1) The District Court's finding that the children would face a recurrence of "acute, severe traumatic stress disorder" if they were repatriated to France was not clearly erroneous;

(2) The District Court properly applied Article 13(b) of the Hague Convention to this finding in reaching the legal conclusion that repatriation of the children would subject them to a "grave risk of psychological harm"; and

(3) The District Court properly considered (a) whether the children were settled in their new environment, and (b) whether Marie–Eline objected to returning to France, as individual and non-conclusive factors in its broader "grave risk" analysis under Article 13(b).

Accordingly, the judgment of the District Court is **AFFIRMED.**