[No. D048841. Fourth Dist., Div. One. Nov. 17, 2006.]

In re the Marriage of TEENA FORREST and SAMUEL LEE EADDY.
TEENA FORREST-BENAVIDES, Appellant, v.
SAMUEL LEE EADDY, Respondent.

COUNSEL

Niddrie, Fish & Buchanan and Martin N. Buchanan for Appellant.

Amanda Bush for Attorney General's Department, Commonwealth of Australia as Amicus Curiae on behalf of Appellant.

Judith Klein for Respondent.

OPINION

McINTYRE, J.—Teena Forrest-Benavides appeals an order of the superior court denying a petition under the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670 (the Convention) to require the return of her 12-year-old daughter, Ashlee, to Australia. She contends that the trial court's denial of the petition violated the Convention and its implementing legislation, the International Child Abduction Remedies Act of 1988 (42 U.S.C.A. § 11601 et seq.). Because the evidence in the record is insufficient to establish a grave risk of harm to Ashlee if she is returned to Australia and also establishes that Australia is Ashlee's country of habitual residence, we agree and reverse the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Ashlee is the daughter of Forrest-Benavides and respondent Samuel Eaddy. Forrest-Benavides and Eaddy were married in Las Vegas in August 1991 and thereafter lived together in San Diego. Ashlee was born to them in March 1994. Forrest-Benavides and Eaddy separated in 1995 and after 1996, Ashlee lived exclusively with Forrest-Benavides. In 1999 Forrest-Benavides initiated divorce proceedings and in August of that year, the San Diego Superior Court entered a final judgment of marital dissolution in accordance with the parties' marital settlement agreement, which provided in part that the parties would have joint legal custody of Ashlee, with Forrest-Benavides having primary physical custody and Eaddy reasonable visitation rights.

In 2003, Forrest-Benavides moved with Ashlee to Australia, with Eaddy's consent, and registered Ashlee as an Australian citizen shortly after their arrival. In October 2005, Eaddy requested that Ashlee visit San Diego for a three-month period during her school vacation and return to Australia before the start of the Australian school year in February 2006. (All further dates are in 2006 except as otherwise specified.) Forrest-Benavides agreed to this request and arranged for Ashlee's 21-year-old half sister, Keesha, to accompany Ashlee on the trip.

In January, while Ashlee and Keesha were in San Diego, Eaddy told Forrest-Benavides that he wanted Ashlee to stay with him until June; Forrest-Benavides objected, but Eaddy refused to abide by the original agreement and on January 31, Keesha returned to Australia by herself. That same day, Eaddy filed an in propria persona petition in the superior court to modify the parties' custody rights to Ashlee so that he would have physical custody. In support of his petition, Eaddy filed a declaration indicating that Ashlee had not adjusted well to life in Australia and wanted to stay with him in San Diego.

Forrest-Benavides opposed Eaddy's petition, submitting her own declaration that Ashlee was doing quite well in Australia, was actively involved in sports and learning the native languages and culture and had gotten a job and attended a Christian youth camp there. Forrest-Benavides's declaration described the contrasts between her home in Western Australia, where Ashlee had her own room and access to many amenities at home and in the surrounding neighborhood, and Eaddy's home in San Diego. Forrest-Benavides contended that Eaddy lived in an apartment in a blighted and dangerous area of East San Diego, that Ashlee shared a room there with the 14-year-old daughter of Eaddy's live-in girlfriend, Schenelle, and that Schenelle was a heavy smoker who smoked in the house despite the fact that Ashlee was asthmatic and Eaddy had a terminal lung condition. She averred that Eaddy worked six days a week, which severely limited his time with Ashlee and left Ashlee to be raised by Schenelle, whom Ashlee hardly knew.

Forrest-Benavides also submitted a declaration by Keesha, who confirmed that Schenelle smoked in the house and said that Ashlee became withdrawn and distant after they arrived in San Diego and that Ashlee frequently missed school while they were there. Keesha stated that during her stay, Eaddy and Schenelle convinced Ashlee to stay in San Diego rather than return to Australia, in part based on false stories about Forrest-Benavides. She also said that Ashlee lied to "get her way" and that Eaddy let Ashlee "get[] away with a lot."

In early March, a family court services counselor filed a report in the superior court indicating that Ashlee's expressed desire was to stay in the United States because Ashlee felt "more comfortable here." Ashlee reported that while she was living in Australia, she was involved in numerous fights with fellow students, was suspended from school, had engaged in cutting herself and had contemplated suicide on one occasion. The counselor concluded that, even if Ashlee was exaggerating her situation in Australia, Ashlee had marks on her arm that were "incontrovertible evidence of some sort of emotional disturbance" and that "forcing [Ashlee] to return to Australia at this time could seriously jeopardize her safety." The report recommended that

the court grant Eaddy physical custody of Ashlee, with Forrest-Benavides's visits to occur in San Diego until Ashlee indicated to her therapist that she felt comfortable traveling to Australia.

Forrest-Benavides responded to the social worker's report by filing declarations and letters from people who knew Ashlee in Australia, including Ashlee's teacher, school principal, family members and a friend. This evidence showed that Ashlee was prone to manipulation and lying and that, contrary to what she had told the social worker, she had many friends and relatives in Australia, had done well in school and was never suspended or threatened with expulsion; several of the declarants also indicated that Ashlee did not show any outward signs of being suicidal or engaging in self-mutilation. Forrest-Benavides indicated that Eaddy had a spotty history of making his child support payments (which started at $150 monthly, but were later increased to $312 a month), and felt that his decision to seek custody of Ashlee was based at least in part on financial reasons.

While the custody proceedings were pending, Forrest-Benavides filed a petition for Ashlee's return with the Australian authorities. The matter was ultimately forwarded to the Child Abduction Unit of the San Diego County District Attorney, which filed the current petition on Forrest-Benavides's behalf seeking to have the family court order Ashlee's return to Australia. Eaddy did not file any opposition or evidence in response to the Convention petition.

In April, the same judge who was presiding over the parties' custody proceedings held a hearing on the Convention petition. The court indicated that it had reviewed the Convention petition, as well as materials submitted in connection with Eaddy's petition to modify custody and with two additional motions that are not included in the record before this court. The court acknowledged that Ashlee's desire was to remain in San Diego, which she considered to be her home, but also recognized that Ashlee described herself as "emotionally disturbed" and that she was prone to exaggeration. It discussed the family law services counselor's report, noting the conclusion that Ashlee's psychological well-being was at risk of harm if Ashlee returned to Australia.

The court questioned whether Australia was Ashlee's "habitual residence" under the law, noting the existence of conflicting published federal cases on that issue; it nonetheless concluded that there was "clear and convincing evidence that returning Ashlee to Australia would involve a grave risk of emotional harm." It denied the petition on that basis and set the custody petition for hearing in July. Forrest-Benavides appeals the denial of the Convention petition.

## DISCUSSION

### 1. *Motion to Augment the Record*

After the completion of briefing on the appeal, we requested and received supplemental briefing relating to the issue of Ashlee's habitual residence. Forrest-Benavides thereafter moved to augment the record to include the petition she filed with the Australian Commonwealth Central Authority for Ashlee's return, as well as certain related or supporting documents. In support of her motion, Forrest-Benavides presented evidence suggesting that the Attorney General's office provided a copy of these materials to the superior court at a hearing on Eaddy's petition to change custody, to alert the court that it could not proceed on the custody matter.

■ A reviewing court may order the record to be augmented to include any document filed or lodged in the case in superior court. (Cal. Rules of Court, rule 12.) However, augmentation may be used only to add evidence that was mistakenly omitted when the appellate record was prepared; the record cannot be "augmented" with material that was not before the trial court. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2005) ¶¶ 4:300, 4:303, 5:134, pp. 4-63, 4-64, 5-39; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1 [19 Cal.Rptr.3d 84].)

Here, the materials submitted in connection with the motion to augment suggest that the Australian petition and the evidentiary support therefor were provided to the superior court, but were later returned without having been filed. Further, although the record makes clear that the court considered certain other materials in connection with the Convention petition, there is no indication that the court considered the proposed augment materials *at that time.* Under these circumstances, we deny the motion to augment. (See *People v. Pearson* (1969) 70 Cal.2d 218, 221–222, fn. 1 [74 Cal.Rptr. 281, 449 P.2d 217] [recognizing that although an appellate court may augment the record, this authority extends only to material " 'offered at or used on the trial or hearing below' "].)

■ Forrest-Benavides alternatively requests that we take judicial notice of these materials. However, matters of which judicial notice is taken are considered only for their existence, not for the truth of the matters asserted in them, which is what Forrest-Benavides is seeking here. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063–1064 [31 Cal.Rptr.2d 358, 875 P.2d 73].) Further, judicial notice is ordinarily limited to matters considered and in the record when the court ruled (*Vons Companies, Inc. v. Seabest*

*Foods, Inc., supra,* 14 Cal.4th at p. 444, fn. 3) and, as discussed above, there has been no showing here that the court considered the materials for which judicial notice is requested at the hearing on the Convention petition. For these reasons, we also deny Forrest-Benavides's alternative request for judicial notice.

## 2. The Convention

### A. General Principles

■ The Convention, to which the United States and Australia are both signatories, was adopted in an effort "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." (Convention, Preamble; see *Mozes v. Mozes* (9th Cir. 2001) 239 F.3d 1067, 1069–1070.) To deter parents from crossing international boundaries to secure a more favorable forum for the adjudication of custody rights, the Convention provides for the prompt return of a child who is "wrongfully removed to or retained in" any country that has signed on to the Convention. (Convention, art. 1; see *Blondin v. Dubois* (2d Cir. 1999) 189 F.3d 240, 246 (*Blondin I*); see also *Holder v. Holder* (9th Cir. 2004) 392 F.3d 1009, 1023, and authorities cited therein [noting that the Convention contemplates a decision within six weeks after the filing of a petition thereunder].) It thus provides a means by which to restore the status quo when one parent unilaterally removes the child from the child's country of habitual residence and/or retains the child in a new jurisdiction. (*Mozes v. Mozes, supra,* 239 F.3d at pp. 1069–1070.)

The only function of a proceeding under the Convention is to decide whether a child should be returned to the country of the complaining parent; it does not govern the merits of parental custody disputes, but leaves those issues to be determined by appropriate proceedings in the child's country of habitual residence. (Convention, arts. 16, 19; 42 U.S.C.A. § 11601(b)(4); *Croll v. Croll* (2d Cir. 2000) 229 F.3d 133, 137, fn. omitted; *Friedrich v. Friedrich* (6th Cir. 1996) 78 F.3d 1060, 1063 (*Friedrich II*).) Thus the issue of which placement is better for the child in the long run is irrelevant. (*Nunez-Escudero v. Tice-Menley* (8th Cir. 1995) 58 F.3d 374, 377.) Further, until such time as a determination is made as to whether the child must be returned pursuant to the Convention, no court in the nation in which the child is being held has jurisdiction to decide the merits of a custody dispute relating to the child. (*Mozes v. Mozes, supra,* 239 F.3d at p. 1070; *March v. Levine* (6th Cir. 2001) 249 F.3d 462, 468.)

■ The removal or retention of a child is to be considered "wrongful" pursuant to the Convention where it breaches the petitioner's rights of custody, provided that the petitioner was exercising those rights at the time of the retention or removal. (Convention, art. 3; 42 U.S.C.A. § 11603(e)(1)(A); *Shalit v. Coppe* (9th Cir. 1999) 182 F.3d 1124, 1127–1128; *Wipranik v. Superior Court* (1998) 63 Cal.App.4th 315, 321 [73 Cal.Rptr.2d 734].) The petitioner bears the burden of proving the child's wrongful removal or retention by a preponderance of the evidence. (42 U.S.C.A. § 11603(e)(1).)

If the petitioner succeeds in showing a wrongful removal or retention, the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of four exceptions applies. (See 42 U.S.C.A. § 11601(a)(4); *Blondin I, supra,* 189 F.3d at pp. 245–246.) As relevant here, the Convention recognizes an exception to the requirement for return of the child to her habitual residence where there is a "grave risk" that doing so "would expose [her] to physical or psychological harm or otherwise place [her] in an intolerable situation." (Convention, art. 13, par. b; 42 U.S.C.A. § 11603(e)(2)(A); see *Gaudin v. Remis* (9th Cir. 2005) 415 F.3d 1028, 1034–1035.)

■ In keeping with the strong presumption that the child subject to proceedings under the Convention should be returned to her country of habitual residence, the grave risk exception is narrow and does not give "license for a court in the abducted-to country to speculate on where the child would be happiest." (*Friedrich II, supra,* 78 F.3d at p. 1068; 42 U.S.C.A. § 11601(a)(4); see *Walsh v. Walsh* (1st Cir. 2000) 221 F.3d 204, 219–221.) "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.' " (*Blondin I, supra,* 189 F.3d at p. 246.)

Absent extreme circumstances in the country of habitual residence (such as war or famine), the grave risk of harm exception is established only if there is clear and convincing evidence that the child would suffer "serious abuse" as a result of being returned. (*Blondin v. Dubois* (2d Cir. 2001) 238 F.3d 153, 163, fn. 11 (*Blondin II*); *Walsh v. Walsh, supra,* 221 F.3d at p. 218.) The classic example of when the exception has been applied is where a child had previously been subjected to sexual abuse by the custodial parent. (Pub. Notice 957, 51 Fed.Reg. 10494, 10510 (Mar. 26, 1986); see also *Walsh v. Walsh, supra,* 221 F.3d at pp. 219–221 [grave risk of harm existed based on evidence that the petitioning parent had a substantial substance abuse problem, an uncontrollable temper, a history of generalized violence, including spousal abuse, and a history of disobeying court orders].)

B. *Did Eaddy Show That Returning Ashlee to Australia Would Create a Grave Risk of Harm?*

Here, the family court denied Forrest-Benavides's petition on the ground that, regardless of whether Ashlee's habitual residence was in the United States or Australia, returning Ashlee to Australia would create a grave risk of harm to her. We review this determination de novo (*Blondin II, supra*, 238 F.3d at p. 158) and conclude that Eaddy's evidence failed to establish that the grave risk exception applied here.

 Eaddy did not present any evidence that returning Ashlee to Australia would create a grave risk of harm to her (in fact, he did not present any evidence at all) in opposition to Forrest-Benavides's Convention petition. Further, assuming without deciding that the superior court properly considered the evidence previously submitted by the parties in connection with Eaddy's petition to modify custody, that evidence did not establish a grave risk of harm on a clear and convincing basis. (See *Friedrich II, supra*, 78 F.3d at p. 1068 [recognizing that a parent cannot "be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which [she was] abducted"].) Although there was some evidence suggesting that Ashlee had engaged in self-mutilation and once contemplated suicide while she was living in Australia, this evidence was based exclusively on statements made by Ashlee, whose credibility everyone (including the family services counselor and the superior court) questioned. Moreover, no evidence was presented to establish that any such conduct on Ashlee's part resulted from the fact that she was living in Australia rather than California or, put another way, that she would have refrained from engaging in similar conduct if she had been in her father's care.

Even if the evidence had supported a conclusion that returning Ashlee to Australia would create some risk of harm, the court could not deny Forrest-Benavides's petition without also finding that (1) the Australian courts were incapable of or unwilling to adequately protect Ashlee (*Friedrich II, supra*, 78 F.3d at p. 1069 [even in cases of serious abuse or neglect, there is no grave risk of harm unless the evidence shows that the court in the country of habitual residence is incapable or unwilling to give the child adequate protection]); and (2) there were no alternative remedies that it could implement to avoid or minimize the risk of harm that would otherwise exist and allow Ashlee's return to Australia. (*Gaudin v. Remis, supra*, 415 F.3d at p. 1036; *Blondin I, supra*, 189 F.3d at pp. 248–250 [holding that, in light of evidence of physical abuse by the custodial parent, the district court erred in failing to consider alternative remedies, including temporary placement of the children with a suitable third party in the custodial parent's home country pending a custody determination there].)

Here, the court did not engage in any such analysis before denying Forrest-Benavides's petition. In the absence of any evidence suggesting either that the Australian courts would be incapable or unwilling to protect Ashlee or that alternative remedies (such as allowing Ashlee to return on the condition that Forrest-Benavides take Ashlee for periodic physical examinations or therapy) would not ameliorate the risk of harm, the court was required to grant Forrest-Benavides's petition and order Ashlee's return to Australia unless the United States, rather than Australia, was the place of Ashlee's habitual residence.

## C. *Where Was Ashlee's Habitual Residence?*

■ The Convention does not define the term "habitual residence," although the cases interpreting it have concluded that the term refers to the child's customary residence prior to the wrongful removal or retention. (*Miller v. Miller* (4th Cir. 2001) 240 F.3d 392, 400, citing *Friedrich v. Friedrich* (6th Cir. 1993) 983 F.2d 1396, 1401 (*Friedrich I*).) Most frequently, the analysis of this issue begins with an examination of the intent of the person or persons entitled to determine where the child lives. (*Mozes v. Mozes, supra,* 239 F.3d at pp. 1073–1075.) If the child has not yet reached a stage in her development that she is deemed capable of making an independent decision about her living arrangements, the parents' last shared intent as to the child's residence is frequently determinative, provided that that intent has been carried out for an appreciable period of time. (*Id.* at pp. 1076–1078; *Gitter v. Gitter* (2d Cir. 2005) 396 F.3d 124, 132–134; *Holder v. Holder, supra,* 392 F.3d at pp. 1016–1017.) (Although there is some authority suggesting that courts should consider the child's intent rather than that of the parents (*Friedrich I, supra,* 983 F.2d at p. 1401), under the circumstances presented, we are not inclined to agree with that authority.)

Although the determination of the relevant intent involves a factual question, the ultimate determination of a child's habitual residence presents a mixed question of law and fact. (*Mozes v. Mozes, supra,* 239 F.3d at p. 1073.) Thus, a trial court considering a petition under the Convention must determine the historical facts and the applicable law and then apply the law to the facts. (*Mozes v. Mozes, supra,* 239 F.3d at p. 1073; *Koch v. Koch* (7th Cir. 2006) 450 F.3d 703, 710.) On appeal, we review the trial court's determination of the historical facts for substantial evidence but conduct a de novo review of the questions of law. (*Koch v. Koch, supra,* 450 F.3d at p. 710.)

Here, the evidence is uncontroverted that Forrest-Benavides moved Ashlee to Australia in 2003 with Eaddy's consent and that Ashlee resided there until she returned to San Diego for a visit in late 2005. This evidence establishes that the parents' last shared intent was for Ashlee to live permanently in

Australia with Forrest-Benavides and that that intent was implemented for an appreciable period of time. Notably, although the superior court (erroneously) rejected the argument that the parents' last shared intent was an appropriate criterion in determining Ashlee's habitual residence, it acknowledged that as a factual matter the application of such a criterion would make Australia the country of Ashlee's habitual residence. That Eaddy's intention later changed does not alter these critical facts. (E.g., *Miller v. Miller, supra,* 240 F.3d at p. 400; *Diorinou v. Mezitis* (2d Cir. 2001) 237 F.3d 133, 141–142.)

### D. *Conclusion*

Based on the foregoing authorities and the superior court's factual findings, which are amply supported by the record, Ashlee's habitual residence was Australia. Because the evidence was insufficient to establish that returning Ashlee to Australia created a grave risk of harm to her, the superior court erred in denying the petition seeking her return to that country and accordingly, we reverse the order denying the petition. Pursuant to the Convention, any attempt to modify the parents' custody rights must occur in Australia. (Convention, arts. 16, 19; 42 U.S.C.A. § 11601(b)(4).)

At oral argument before this court, Forrest-Benavides requested that we enter an order granting her petition under the Convention rather than remanding the matter with directions to the superior court to enter such an order, contending that Code of Civil Procedure section 909 permits us to do so. That statute provides in relevant part: "In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the reviewing court may make factual determinations contrary to or in addition to those made by the trial court. . . . The reviewing court may for the purpose of making the factual determinations *or for any other purpose in the interests of justice,* take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, *and may give or direct the entry of any judgment or order and may make any further or other order as the case may require. This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court . . . .*" (Code Civ. Proc., § 909, italics added.) Forrest-Benavides urges that the italicized language provides a basis for our entering a direct order without any remand, to facilitate a prompt resolution of the matter in keeping with the policies underlying the Convention. Eaddy responded that he objects to the proposed procedure but is willing to stipulate to the immediate issuance of the remittitur to address Forrest-Benavides's concerns. Because the parties have not had the opportunity to file any briefs on the issue of our authority to act under Code of Civil Procedure section 909, we deny Forrest-Benavides's request, but order the immediate issuance of the remittitur in accordance with the parties' stipulation.

## DISPOSITION

The order denying the petition seeking Ashlee's return to Australia is reversed and the matter is remanded with directions to the superior court to issue a new order forthwith granting the petition and requiring Ashlee's immediate return to Australia. Forrest-Benavides is awarded her costs of appeal. In the interests of justice and based on the parties' stipulation, the clerk of this court shall issue the remittitur forthwith. (Cal. Rules of Court, rule 26(c)(1).)

McConnell, P. J., and Benke, J., concurred.