864 So.2d 1275 (2004)
Holly STROUT a/k/a Holly Steere, Appellant,
v.
Kevin Clyde CAMPBELL, Appellee.
No. 5D02-2724.
District Court of Appeal of Florida, Fifth District.
February 6, 2004.
Ryan Thomas Truskoski of Ryan Thomas Truskoski, P.A., Orlando, for Appellant.
Shannon McLin Carlyle and Gilbert S. Goshorn, Jr., of The Carlyle Appellate Law Firm, The Villages, for Appellee.
*1276 THOMPSON, J.
Holly Strout appeals a judgment awarding primary custody of the parties' two children to Kevin Clyde Campbell, the father, and ordering her to transfer custody to him within 30 days. We affirm.
The parties have never been married. In 1996, in the Circuit Court for the Ninth Judicial Circuit, the mother obtained a judgment of paternity against the father with respect to the older child. In 1999, she instituted this proceeding to establish the paternity of the parties' second child. The mother had primary custody of the older child but in this paternity proceeding, the father sought primary custody of both children. During the litigation, the children were removed from the mother by the Department of Children and Family Services based on allegations of neglect, and the father was then given temporary custody of the older child. The mother was allowed to retain custody of the infant because it was being breast-fed. The mother absconded with both children to Germany during her first unsupervised visitation with the older child. It is apparent from the record that while living in Germany, the mother married a member of the United States Armed Forces.
In May 2001, the court entered a final judgment giving the father sole parental responsibility for the children. This judgment was vacated on the mother's motion, which alleged that she had not been given notice of the hearing or a copy of the final judgment. The mother alleged that the father knew exactly where in Germany she was located, as evidenced by the fact that on the same day the final judgment was issued, both parties were before a court in Germany for a hearing on the father's petition for the repatriation of the children under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"). Attached to the mother's motion was an English translation of the German court's order denying the father's petition for repatriation of the children.
After vacating the judgment, the circuit court rescheduled the trial and ordered the parties to submit pretrial memoranda. On the father's motion, the court entered an order precluding the mother from presenting evidence on the ground that the mother had not filed any pretrial papers and had not made herself available for discovery. The father also stated in his motion that warrants for the mother's arrest had been issued and that he would object if she sought to appear at trial by telephone. On the day of trial, at which the mother was represented by counsel but did not appear herself, an FBI agent was waiting "in the hallway."[1] The court entered the judgment on appeal over the objection of counsel for the mother that the Convention proceedings had divested it of jurisdiction. On appeal, the mother contends that the judgment is void because the trial court lacked jurisdiction to enter it.
In 1988, the United States entered the Convention, the text of which can be found in Duquette v. Tahan, 252 N.J.Super. 554, 600 A.2d 472 (Ct.App.Div. 1991). The objects of the Convention are to "secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Convention, art. 1. The removal of a child is considered wrongful if it is "in breach of rights of custody ... under the law of the *1277 State in which the child was habitually resident immediately before the removal...." Id. art. 3. The Convention seeks to deter parental abductions by eliminating the primary motivation for abductions, which is to obtain an advantage in custody proceedings by commencing them in another country. Holder v. Holder, 305 F.3d 854, 860 (9th Cir.2002). The United States Congress implemented the treaty in 1988 by enacting the International Child Abduction Remedies Act, often referred to as ICARA. See 42 U.S.C. § 11601 et seq. ICARA vests concurrent jurisdiction over claims brought under the Convention in the United States District Courts and in the courts of the states. 42 U.S.C. § 11603(a). Congress has found that the international abduction or wrongful retention of children is harmful to their well-being and that persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention. 42 U.S.C. § 11601(a)(1), (2).
In denying the father's request, the German court cited Article 13 of the Convention, which provides that the "requested State," i.e., Germany in the instant case, is not bound to order the return of the child if the opposing party establishes that, "there is grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The court stated that the local child welfare agency had found just such a risk to the children if they were returned. According to the agency, the older child was afraid of being separated from his mother and having to return to the United States. The court pointed out that an international warrant had been issued against the mother and that she would face a lengthy imprisonment if she traveled to the United States to continue the custody proceedings. Further, the older child stated in court that although the father could visit "every week," he did not want to return to the United States, and the younger child (who was four months of age when the mother absconded to Germany) did not know the father.
The court was concerned that wrenching the children from their mother would have a deleterious effect on them. For this reason, the court stated, "an undertaking was achieved at the hearing,"[2] through which the father promised to meet with the American liaison staff in Germany to insure that the mother would not be arrested if the proceedings were continued in the United States. The parties agreed to meet with a military attorney at an airbase and "to make a written declaration," but *1278 the father did not keep his promise. Instead, he left Germany two days before his scheduled return flight to the United States. The court concluded that the father was not interested in repatriation for the sake of the children or the custody proceeding, but was intent on punishing the mother, with whom the children had a good relationship. Because the children would suffer severe psychological harm by being separated from their mother and having to endure the father's hatred for the mother, the court denied the father's request for repatriation.
The mother states that the German court ruled "that it was in the best interests of the children that they ... remain in Germany," and argues that this ruling "must be respected." The problem with this argument is that we see nothing in ICARA or the Convention itself suggesting that the court of country "in which the child was habitually resident," is divested of jurisdiction over the child custody matter when a parent petitions in the other country for the return of the child, or even when the court of the other country denies the petition. The mother cites no case so holding, and we have found none. The mother cites 42 U.S.C. § 11603(g) of ICARA, which provides:
Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.
That provision does not apply in this case, however, because this case, a paternity case, is not an ICARA proceeding and is therefore not one brought "under this chapter." Although, Bekier v. Bekier, 248 F.3d 1051, 1053 (11th Cir.2001), states that "[t]he Hague Convention determines which contracting state has jurisdiction to resolve the underlying custody dispute," because nothing in ICARA purports to divest the jurisdiction of the court in the country of habitual residence, we must conclude that the court below acted properly.
AFFIRMED.
PLEUS and TORPY, JJ., concur.
NOTES
[1] The father states in his brief that the mother is guilty of kidnapping and interference with child custody. He testified at trial that he would like to see the mother arrested and prosecuted.
[2] Blondin v. Dubois, 238 F.3d 153, n. 8 (2nd Cir.2001), explains the term "undertaking":

Although the Hague Convention does not use the term "undertaking," in cases under the Convention courts use the term "undertaking" to refer to a promise by the petitioning parent "to alleviate specific dangers that might otherwise justify denial of the return petition. Typical undertakings concern support, housing and the child's care pending resolution of the custody contest." Carol S. Bruch, The Central Authority's Role Under the Hague Child Abduction Convention: A Friend in Deed, 28 Fam. L.Q. 35, 52 n. 41 (1994) (explaining use of undertakings by British courts). See also Symposium, Women, Children and Domestic Violence: Current Tensions and Emerging Issues, remarks by Linda Garder, 27 Fordham Urb. L.J. 567, 757 (2000) (noting increasing use of undertakings by United States courts); Walsh [v. Walsh,] 221 F.3d [204,] 219 [(1st Cir.2000)] ("The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction."); Croll [v. Croll], 229 F.3d [133,] 135 n. 1 [(2d Cir.2000)]; Feder [v. Evans-Feder], 63 F.3d [217,] 226 [(3d Cir.1995)].