[No. C061316. Third Dist. Apr. 7, 2010.]

KARLA CECELIA ESCOBAR, Plaintiff and Appellant, v.
CESAR FLORES, Defendant and Respondent.

738

COUNSEL

Law Offices of Edwing Frank Keller and Edwing Frank Keller for Plaintiff and Appellant.

C. Athena Roussos for Defendant and Respondent.

OPINION

ROBIE, J.—This appeal arises out of a petition filed by plaintiff Karla Cecelia Escobar (mother) under the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11,670[1] (the Hague Convention or the Convention) for the return of her eight-year-old son, Cesar, to his habitual residence with her in Chile. The primary issue on appeal is whether the trial court erred in refusing to order defendant Cesar Flores (father) to return the child based on a finding that the child objected to being returned to Chile and had attained an age and degree of maturity at which it was appropriate to take account of his views. Finding no error in that finding, and no merit in the other arguments mother asserts on appeal, we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Cesar was born in Reno, Nevada, on August 5, 2000, to mother and father, who were not (and have never been) married. According to father, at the time both parents were living in Mammoth Lakes, California. (Information in the record indicates both parties have relatives in Mammoth Lakes.)

In March 2004, father agreed that mother, who was not a legal resident of the United States, could take Cesar to Chile. Father claims mother was

---

[1] See title 42 United States Code section 11601 et seq.

returning to Chile for only seven months, to visit family, and that Cesar was to return to the United States at the end of the visit, with or without mother. Mother claims that father knew she and Cesar were relocating to Chile and did not intend to return to the United States.

Father claims that after about six months, mother informed him she would not be returning to the United States. In 2005, mother obtained a custody order from a Chilean court. Father contends he did not receive notice of the Chilean custody proceeding. In any event, despite learning that mother did not intend to bring Cesar back to the United States, father did nothing to seek the return of the child from Chile under the Hague Convention.

From 2004 through 2008, Cesar resided with mother in Chile. Meanwhile, in 2005 father married and moved to North Carolina.

In August 2008, mother sent Cesar to visit with her sister in Mammoth Lakes. (Mother could not obtain a visa to enter the United States herself.) Father learned of the visit, traveled to Mammoth Lakes, and arranged for a visit with Cesar. On August 12, apparently during that visit, father filed a petition in Mono County Superior Court to establish his parental relationship with Cesar (case No. 16523) and obtained an order in that case granting him temporary custody of Cesar, along with the right to take Cesar with him back to North Carolina until the next hearing.

Ten days later, on August 22, mother filed in Mono County her petition under the Hague Convention for the return of Cesar to Chile. The petition was originally filed under the same case number as father's parental rights petition.

Father filed his response to mother's Hague Convention petition in September 2008. Among other things, father asserted the court should refuse to order the return of Cesar to Chile under an unnumbered provision in article 13 of the Convention that allows a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."

A hearing on father's petition to establish his parental relationship with Cesar and on mother's petition under the Hague Convention was held on October 17, 2008. Neither party appeared personally. The court ordered that a separate case number be assigned to mother's petition (case No. 16581) and stayed the proceedings on father's petition. The court then granted mother's motion to continue the hearing on her petition to December.

The continued hearing was held on December 24, 2008. Mother was present; father appeared by telephone. Father's attorney conceded the amount

of time Cesar lived with mother in Chile was sufficient to establish Chile as his country of habitual residence for purposes of the Hague Convention, and the court so found. After determining that neither party objected to venue or jurisdiction in Mono County, the court moved on to Cesar's objection to returning to Chile. The parties agreed to have the court question Cesar in chambers, but mother objected to the examination occurring over the telephone. The court agreed that interviewing Cesar by telephone would not be sufficient and continued the hearing to January so that father could bring Cesar to California.

The next hearing, with Cesar and both parents present, was held on January 9, 2009. At the outset, mother's attorney argued that the court should not interview Cesar because "the courts have all agreed that a nine-year-old is not of sufficient age of maturity to" object to return to his country of habitual residence. The court rejected that argument, and mother's attorney then asserted that he wanted to offer evidence of "coaching or undue influence on" Cesar, including a statement allegedly made by father's attorney just that morning. The court decided to hear that evidence immediately.

The first witness, Maria Alejandra Kaiser, testified that when she was two or three feet away from Cesar outside the courtroom waiting for the hearing to start, she heard father's wife talking to Cesar about having to talk to the judge and then heard father's attorney say to the child, " 'Did you talk to your dad about you have to say to the Judge you don't want to leave the U.S. or the states,' something like that."

The second witness, Pedro Escobar (mother's uncle), testified that when he was at the courthouse "this past Wednesday" he heard mother call to Cesar and heard father say to the child, " 'Tell her that you don't want to.' " He also testified, however, that father did not prevent mother from visiting with and talking to Cesar, and she hugged the child and told him, " 'Please don't be lying, don't be doing this.' " As father's attorney tried, on cross-examination, to get the witness to admit the visit between mother and Cesar lasted at least 10 minutes, the court interrupted, saying, "I just think this is de minimis in terms of any evidence of coaching. I am not sure any further cross-examination is of any benefit."

When mother's attorney told the court he had no further witnesses except mother, the court said, "I just don't see this as evidence of coaching. . . . Let's get back to the real issues," by which the court meant the incident to which Kaiser had testified. On that issue, father called his wife, Krista Marie Flores, to testify, and she testified that Cesar was "very upset about everything going on," and they tried to calm him. She said that father's attorney asked Cesar, " 'Have you talked to your father about what you want to do and what you

want to talk to the Judge about?' " She further testified that "[t]he only thing [they had] been telling [Cesar was] he knows what he wants and he has to do what's best for him, and to tell the Judge what's in his heart, and not worry about [her] or his father or what his mother thinks, he has to tell what's in his heart." She said neither she nor father's attorney told Cesar that morning that he was "to tell the Judge he does not want to go to Chil[e]," but Cesar had "stated that multiple times on his own."

Mother's attorney indicated that mother would testify about "how the child had been acting along this last four months, and [how] in her views [*sic*] this child has changed towards her" as evidence of coaching, but the court decided to take that testimony after the interview with Cesar, which the court decided (without objection) to conduct in chambers, with the attorneys, bailiff, court clerk, and court reporter present.

In chambers, Cesar told the court he was not afraid and that he lived in North Carolina, where he was in third grade at Wrightsboro Elementary School. He liked math and recess and had eight or nine friends, including one in his class and one next door. Before he lived in North Carolina, he lived in Chile, in the city of Valparaiso, where he did not like school because it was "a little boring." When the court asked him if anybody had told him what to say, he responded, "Yes, that it was in my heart." When the court asked him what was in his heart, he said, "That I want to stay here" "[b]ecause I have my, I like my house" "[a]nd I like to live with my sister and with my dad. And I like my school. I have many friends. And we go to many places there, like the beach and aquarium and YMCA."

When the court asked Cesar to tell him about Chile, Cesar responded, "I don't have many friends. I just had one close to my house. And I didn't have my own room, my TV, and my own bed. And my mom leaves me alone in the house when she is come to work, and I watch TV when she is not there. And she makes me go shop night and day by myself." Cesar said he would feel "[b]ad" if he had to go back to Chile "because I like for here not there. I feel good in here, not in Chil[e]."

Mother's attorney elicited that Cesar was "going out alot" to "places to play" like the "[a]quarium," but when he sought to elicit that father was "buying [Cesar] all [he] want[ed]," Cesar responded, "Not so much," and "I don't pick things everyday." Cesar did say that he had "many toys," including a Nintendo DS that father bought him. In response to the question, "And he is pleasing you?" Cesar volunteered, "And I want to stay over here in America because I like to learn English." Cesar then said he did not miss his mother and he liked living with his father.

When mother's attorney asked him if there were any other reasons he did not want to go back to Chile, Cesar responded, "I just have one, that I don't like my bus of my school. And my mom in the morning has to get me to the school, and I don't like my bus because it's little, it's not so big like the buses in America." When mother's attorney asked him if he knew what would happen to him if he stayed in the United States and did not go back to Chile, Cesar responded, "I'll be happy." Cesar then said he did not enjoy time with mother in Chile. He admitted talking to father about what he was going to be talking about in court "ten or six" times, and father told him he did not have to be afraid and that he had to say "that is in my heart." He then said that what was in his heart was that he wanted to stay in North Carolina.

In closing, mother's attorney elicited that Cesar had a pet dog in Chile, but he did not "need" it anymore because he wanted another pet, "a kind of lizard that has little things that are sharp."

The court elicited that Cesar knows what it means to tell the truth, and the truth was that he wanted to stay here.

On questioning by father's attorney, Cesar said he had told father's attorney he wanted to visit Chile when he was older but for now he did not want to go back. He also said he had been learning English for five months and it was important to him to learn to speak English. It was also important for him to be with his three-year-old sister, Isobel, because he loves her. Cesar ended with saying he "love[s] it here in America."

Mother testified that she had always lived under the same roof as Cesar, and her relationship with him "[b]efore any of this happened . . . was excellent." She said that "[b]efore any of this happened they communicated very well," but that "[l]ittle by little he stopped communicating with her" and he is now "[a] lot more distant." She said he is not more mature than a normal eight year old and he can be easily coached, managed, or misled because he is very obedient and listens to his elders.

Father testified that when Cesar first came to live with him, the child would talk with mother at length on the telephone three times a week, but then he started saying he was bored with the conversation and did not want to talk to her anymore but did not know how to say that to her. Father claimed he never told Cesar that the child had to tell the court he did not want to go back to Chile, but he "need[ed] to follow his heart, wherever he is happier, wherever he feels more comfortable."

After hearing argument from counsel, the court stated that it found Cesar to be "extremely communicative" and did not find "he was under any undue

influence in telling the Court what he did tell me." The court felt Cesar "was both forthright and unequivocal in his responses" and "demonstrated a sufficient degree of maturity to raise an objection." Finding that Cesar "has attained an age and degree of maturity sufficient for this Court to take into account his views," the court determined that the child's "views amount to an objection to being returned to Chil[e]," and the court therefore "refuse[d] to order the return of the child to Chil[e]." Mother requested a statement of decision, and the court directed father's attorney to prepare it.[2]

On February 25, 2009—before the statement of decision had been entered—mother filed a notice of appeal from the "judgment" entered January 9, 2009. Subsequently, on March 5, 2009, the court entered a statement of decision consistent with its oral ruling and the minutes of the January 9 hearing.[3]

## DISCUSSION

### I

### *The Hague Convention*

■ We begin with an overview of the Hague Convention. "Adopted in 1980, the Hague Convention on the Civil Aspects of International Child Abduction . . . is intended to prevent 'the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.' [Citation.] Despite the image conjured by words like 'abduction' and 'force,' the Convention was not drafted in response to any concern about violent kidnappings by strangers. It was aimed, rather, at the 'unilateral removal or retention of children by parents, guardians or close family members.' [Citation.] . . . The preamble to the Convention describes the signatory states as '[d]esiring to protect children internationally from the harmful effects of their wrongful removal or retention,' effects which are thought to follow when a child 'is taken out of the family and social environment in which its life has developed.' " (*Mozes v. Mozes* (9th Cir. 2001) 239 F.3d 1067, 1069–1070, fns. omitted.)

---

[2] Resuming proceedings in the other case (No. 16523), the court ordered that the temporary custody order would remain in effect, then set a status conference with the expectation that father would seek to move the custody proceeding to North Carolina in the interim.

[3] It appears no formal written order, separate from the "Family Law Minutes" of the January 9, 2009, hearing and the statement of decision filed March 5, 2009, was ever filed in the trial court. Nevertheless, whether we treat this as a timely appeal from a minute order reflected in the "Family Law Minutes," or as a premature appeal from a more formal order contained in the statement of decision, the matter is properly before us.

Under the Convention, "when a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 [of the Convention] provides that the latter state 'shall order the return of the child forthwith.' " (*Mozes v. Mozes, supra*, 239 F.3d at p. 1070.)

■ "The key operative concept of the Convention is that of 'wrongful' removal or retention. In order for a removal or retention to trigger a state's obligations under the Convention, it must satisfy the requirements of Article 3:

"The removal or the retention of a child is to be considered wrongful where—

"a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

"b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." (*Mozes v. Mozes, supra*, 239 F.3d at p. 1070.)

■ "Once a petitioner under the Convention has demonstrated by a preponderance of the evidence that removal [or retention] of a child was wrongful [citation], the other parent may assert exceptions that, if proven, will prevent the return of the child." (*In re Marriage of Witherspoon* (2007) 155 Cal.App.4th 963, 973–974 [66 Cal.Rptr.3d 586].) One such exception, which appears in an unnumbered paragraph of article 13 of the Convention, provides as follows: "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." (See *In re Marriage of Witherspoon, supra*, 155 Cal.App.4th at p. 975.) "The importance of this exception is explained in the Pérez-Vera Report on the Convention:[4] '[T]he Convention also provides that *the child's views concerning the essential question of its return or retention may be conclusive*, provided it has, according to the

4 " 'Elisa Perez-Vera served as "the official Hague Conference reporter for the Convention," and her explanatory report "is recognized by the Conference as the official history of and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." [Citations.] "Because a treaty ratified by the United States is not only the law of this land[] . . . but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (travaux preparatoires) and the postratification understanding of the contracting parties." ' " (*In re Marriage of Witherspoon, supra*, 155 Cal.App.4th at p. 972, fn. 7, quoting *Whallon v. Lynn* (1st Cir. 2000) 230 F.3d 450, 455, fn. 5.)

competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests.' (Pérez-Vera, Explanatory Rep. [on 1980 Hague Child Abduction Convention], ¶ 30, p. 433[, reprinted in part in 51 Fed.Reg. 10494 (Mar. 26, 1986)], italics added.) 'In applying the "age and maturity" exception, a court must not focus solely on the general goal of the Convention—to protect children from the harmful effects of wrongful removal—but must also carefully determine that the particular child " 'has obtained an age and degree of maturity at which it is appropriate to take account of its views.' " ' " (*In re Marriage of Witherspoon, supra*, 155 Cal.App.4th at pp. 975–976.)

■ Procedurally, federal law provides that state courts and federal courts have "concurrent original jurisdiction of actions arising under the Convention." (42 U.S.C. § 11603(a).) A "person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." (*Id.*, § 11603(b).) Federal law further provides that "[t]he court in which [such] an action is brought . . . shall decide the case in accordance with the Convention." (*Id.*, § 11603(d).)

## II

### Age and Maturity Exception to Return of the Child

Mother contends "the pivotal issue" on appeal "is whether the minor child's objection [to being returned to Chile] was based upon a sufficient demonstration to the trial court of the child's age and maturity as to constitute an Article 13 'exception' to the general rule that the minor child is to be returned to his country of habitual residency." Mother contends it was not.[5] We conclude otherwise.

Before addressing this argument, we must identify the appropriate standard of review. Mother contends we "must review the trial court's factual determinations for clear error, and its application of the treaty to those facts de novo." (Italics omitted.) She contends that although "a conclusion as to whether a child has 'attained an age and degree of maturity at which it is

---

[5] Father contends we should "exercise [our] discretion to hold that [mother] has waived her claims that the judgment lacks factual support" because mother "failed to fairly summarize the relevant evidence in her opening brief" and "also cites to numerous facts with no citation to the record, and many with no support in the record." We decline to do so.

appropriate to take account of his views' " is "fact-specific," such a conclusion "ultimately rests on a legal determination of whether the discrete facts add up to a showing that he is of 'sufficient age and maturity' within the meaning of Article 13." Thus, in mother's view, our review is ultimately de novo.

Father contends the determination of whether Cesar had "attained an age and degree of maturity at which it is appropriate to take account of [his] views" is "essentially [a] finding[] of fact that should be reviewed for substantial evidence or clear error."

No California case has addressed this issue. Moreover, the California courts have not been entirely consistent on the standard of review that applies generally in Hague Convention cases. (See *In re Marriage of Witherspoon, supra*, 155 Cal.App.4th at p. 971 ["In an action under the Convention, we review the lower court's . . . findings for clear error and its legal conclusions de novo."]; *In re Marriage of Forrest & Eaddy* (2006) 144 Cal.App.4th 1202, 1213 [51 Cal.Rptr.3d 172] ["On appeal [in an action under the Convention], we review the trial court's determination of the historical facts for substantial evidence but conduct a de novo review of the questions of law."].)

In *Blondin v. Dubois* (2d Cir. 2001) 238 F.3d 153, the circuit court concluded that a determination under the Hague Convention of whether a child was "old enough and mature enough at eight years of age for her views to be considered" was a "factual finding[]" reviewable for clear error. (*Blondin*, at p. 158.) Clear error is the standard under the Federal Rules of Civil Procedure for appellate review of trial court findings of fact.[6] Like "the familiar and highly deferential substantial evidence standard of review" that we apply to factual findings under state law (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567 [90 Cal.Rptr.3d 644]), the federal "clear error" or "clearly erroneous" standard of review is deferential to the finder of fact (see *Anderson v. Bessemer City* (1985) 470 U.S. 564, 573–574 [84 L.Ed.2d 518, 528, 105 S.Ct. 1504]). Under the federal standard, " '[a] finding is "clearly erroneous" [only] when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " (*Id.* at p. 573 [84 L.Ed.2d at p. 528].)

We agree with the circuit court in *Blondin* that the determination of whether a particular child "has attained an age and degree of maturity at which it is appropriate to take account of its views" is a factual issue for

---

[6] "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." (Fed. Rules Civ.Proc., rule 52(a)(6), 28 U.S.C.)

which deferential appellate review is appropriate. In judging that determination as to Cesar, we have nothing but the cold, unadorned words on the pages of the reporter's transcript. The trial court, on the other hand, had the living, breathing child before it. Thus, the trial court had the ability to judge Cesar's maturity not only by what he said, but by how he said it, and how he presented himself when he said it—in other words, by " 'the nuance, demeanor, body language, expression and gestures' " (*People v. Johnson* (2003) 30 Cal.4th 1302, 1321 [1 Cal.Rptr.3d 1, 71 P.3d 270]) that we, as an appellate court, are denied. Under these circumstances, it would be inappropriate for us to determine Cesar's maturity "de novo," as mother would apparently have us do. Furthermore, as we explain further below, whether we apply the state law (substantial evidence standard) or the federal law (clearly erroneous standard) makes no difference, because under either standard our conclusion is the same—the record here provides no basis for us to overturn the trial court's determination of Cesar's age and maturity.

Mother cites two cases from New Jersey in support of her view that Cesar had not attained sufficient age and degree of maturity for his views to be considered, but neither is particularly helpful here.

At issue in *Tahan v. Duquette* (1992) 259 N.J. Super. 328 [613 A.2d 486]—the first case mother cites—was a separate exception to return under paragraph (b) of article 13 of the Convention, which applies when there is " 'a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.' " (*Tahan*, 613 A.2d at p. 488.) In concluding it "was not plain error" for the trial court to fail to interview a nine-year-old child in connection with a determination of that exception, the appellate court stated the bare conclusion that "an interview with the judge, under the circumstances before the court, could not have served a useful purpose" because "Article 13 of the Convention excuses the duty to return if a child of appropriate age and maturity objects" and "[t]his standard simply does not apply to a nine-year old child." (*Id.* at p. 490.)

█ *Tahan* is not useful because it purports to establish a bright-line rule that nine years of age—and, by logical extension, any younger age—is not "an age . . . at which it is appropriate to take account of [the child's] views," but such a rule is contrary to the intent of the drafters of the Convention. The Pérez-Vera Report on the Convention notes that " 'all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.' " (*de Silva v. Pitts* (10th Cir. 2007) 481 F.3d 1279, 1286.) Because the inquiry into whether a particular child satisfies the age and

maturity exception is necessarily "fact-intensive and idiosyncratic" (*id.* at p. 1287), *Tahan*'s inappropriate application of a bright-line rule does not aid us here.

*Caro v. Sher* (1996) 296 N.J. Super. 594 [687 A.2d 354]—the second case mother cites—involved three children, ages 13, 11, and seven. (*Id.*, 687 A.2d at p. 355.) When her other arguments failed, the mother asked the court to "interview, at least, the older children to determine their wishes as to the return to Spain," for potential application of the age and maturity exception to return. (*Id.* at p. 362.) The court, which was the trial court, not a reviewing court, noted that application of the age and maturity exception "is discretionary" and refused to interview the children, let alone consider applying the exception, because the Spanish courts would "consider the wishes of the children in finally resolving custody, as well as return, issues," and because the court did not want to "add to their discomfort as argued by the [mother], and test to what degree their present views simply reflect the emotional upheaval and their desire, finally, for normalcy and permanency, here if not in Spain." (*Ibid.*)

*Caro* is of no assistance to us because it offers no guidance in conducting appellate review of the fact-intensive and idiosyncratic inquiry into whether a particular child is of sufficient age and maturity for his views on return to be taken into account.

A case that *is* of some assistance to us is *de Silva v. Pitts, supra*, 481 F.3d at page 1279. There, after noting that "decisions applying the age and maturity exception are understandably disparate" "[g]iven the fact-intensive and idiosyncratic nature of the inquiry," the court detailed the child's interview with the court in chambers, then noted the magistrate judge's conclusion that the child was " 'a bright, expressive child with a well-developed understanding of his situation and the positions of his parents' " and had thus " 'attained an age and degree of maturity to so consider his views.' " (*Id.* at p. 1287.) The appellate court also noted the magistrate judge's determination that she " 'did not find [the child] to be particularly swayed by lavish gifts and wealth in forming an opinion that the schools were better in Oklahoma, he enjoyed his friends and activities and his home. He is well-settled in his environment in Oklahoma and expressed his desire to remain in Oklahoma with [his father] without apparent adult indoctrination.' " (*Ibid.*) Noting that it was "mindful of the magistrate judge's opportunity to observe [the child] in person," the appellate court "accord[ed] great deference to the [trial] court's findings based on that experience" and found "no error in the district court's ultimate conclusion that [the child] should remain in Oklahoma" under the age and maturity exception to return. (*Id.* at pp. 1287–1288.)

Although *de Silva* involved a 13-year-old child (*de Silva v. Pitts, supra,* 481 F.3d at p. 1286, fn. 7), the case is also useful because it notes previous decisions that directly support the proposition that an eight-year-old child is not necessarily too young for his or her views on return to be considered (*id.* at p. 1287). For instance, in *Anderson v. Acree* (S.D. Ohio 2002) 250 F.Supp.2d 876, the district court found an eight-year-old girl to be "of sufficient age and maturity to permit this court to consider her views as to whether she should be returned to New Zealand" based on the "court's observations of [the child in chambers] and the other evidence presented in th[e] case." (*Id.* at pp. 883–884.) In *Raijmakers-Eghaghe v. Haro* (E.D.Mich. 2001) 131 F.Supp.2d 953, the district court rejected the argument that the court, "as a matter of law, cannot take into account the views of an eight-year-old," noting "[t]he Hague Convention itself contains no age limit for applying this exception." (*Id.* at p. 957.) Finally, in *Blondin v. Dubois, supra,* 238 F.3d at page 153, the appellate court determined that the district court did not clearly err in determining that an eight-year-old girl "was old and mature enough for her views to be considered in" the context of determining whether return would expose the child to a grave risk of harm. (*Id.* at p. 166.)

With the foregoing in mind, we turn back to mother's argument here that Cesar had not attained sufficient age and degree of maturity for his views to be considered. Focusing on Cesar's statements about having many toys and going out to places to play, contrasted with his assertion that he did not miss mother and did not enjoy time with her in Chile, mother argues that "[i]t appears . . . father is providing the minor child with many toys and attention to unduly influence the child's decision of what 'home' is in his heart." She further claims that Cesar's very testimony "shows [his] lack of maturity" because he "demonstrated an absolute bias toward his new life and his new family and completely disregarded his mother." Thus, in mother's view, Cesar's "desire to remain in the United States was not based upon age and newfound maturity, [but instead] his thoughts were mere[ly] those of a selfish 8 year old child, who had been influenced and biased against going back to the country of Chile."

In effect, however, what mother is asking us to do is merely draw different inferences from Cesar's statements than the trial court drew. While the inference that Cesar did not have sufficient maturity and was unduly influenced to prefer remaining with his father in North Carolina to returning with his mother to Chile might have been a reasonable one, it is one the trial court chose not to draw. Instead, the court found Cesar to be "extremely communicative" and did not find "he was under any undue influence in telling the Court what he did." The court also felt Cesar "was both forthright and unequivocal in his responses" and "demonstrated a sufficient degree of maturity to raise an objection."

On this record, we cannot say the inferences the trial court drew were unreasonable, and this precludes us from overturning the court's determination. Under the substantial evidence standard of review, "where two or more different inferences can reasonably be drawn from the evidence, this court is without power to substitute its own inferences for those of the trial court and decide the case accordingly." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1122 [94 Cal.Rptr.2d 579].) Similarly, under the clearly erroneous standard of review, "If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (*Anderson v. Bessemer City, supra,* 470 U.S. at pp. 573–574 [84 L.Ed.2d at p. 528].) Thus, under either standard of review, because mother has not shown that her view of the evidence is the *only* reasonable view, we must defer to the trial court's findings, and to its determination that Cesar was of sufficient age and maturity for his views on return to Chile to be considered.

## III

### *Standing*

At various points in her brief, albeit not under the "separate heading or subheading" required by rule 8.204(a)(1)(B) of the California Rules of Court, mother asserts that father lacked standing to oppose her petition. We are not persuaded.

Mother purports to challenge father's standing because he "has not been adjudged to be the father of the minor child." In her view, because a person must be exercising a right of custody to *bring* a petition under the Hague Convention, a party must have a right of custody to *oppose* such a petition. We reject this argument because mother did not make it in the trial court and offers no authority in support of it. Moreover, we note that mother admitted in her petition that she and father "are the parents of" Cesar. She also submitted to the court a Chilean birth certificate that she obtained which identifies Cesar Garcia Flores as the child's father. Under all of these circumstances, mother's argument that father could not oppose her Hague Convention petition because he has not yet been adjudicated to be Cesar's father is without merit.

IV

*Temporary Custody*

Mother contends the trial court did not have jurisdiction to give father temporary custody of Cesar. This argument seeks collaterally to challenge a ruling the court made in a different case—the one based on father's petition to establish a parental relationship with Cesar—that is not before us. Therefore, we cannot consider it.

Mother contends that once she filed her Hague Convention petition, "the trial court should have rescinded its orders for temporary custody and ordered the minor child to [her] custody . . . pending the Hague Convention determination" because the filing of a Hague Convention petition stays all state court matters. We disagree.

Article 16 of the Convention provides that "[a]fter receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice." Assuming this is the provision that "stays" "all state court matters" (since mother identifies no other such authority), the trial court complied with this provision, or at least mother has failed to show that it did not comply.

From the record it appears the earliest notice the court had of the wrongful detention of Cesar was on August 22, 2008, when mother filed her petition under the Hague Convention. By that time, however, the court had already granted temporary custody of Cesar to father in the parental relationship case father filed on August 12. By leaving that temporary custody order in place and staying further proceedings on father's petition until it decided mother's petition, the trial court complied with the directive in the Convention not to "decide on the merits of rights of custody" until after it "determined that the child [wa]s not to be returned under th[e] Convention." Mother has offered no authority to support her assertion that what the trial court should have done instead is rescind its order of temporary custody to father and honor her Chilean custody order in its place pending determination of her Hague Convention petition.

## DISPOSITION

The order denying mother's petition is affirmed. Father shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Sims, Acting P. J., and Nicholson, J., concurred.