Filed 7/23/13  Olson v. State Personnel Board CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| KEVIN OLSON, | C067444 |
| Plaintiff and Appellant, | (Super. Ct. No. 49858) |
| v. | |
| STATE PERSONNEL BOARD, | |
| Defendant and Respondent; | |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION et al., | |
| Real Parties in Interest and Respondents. | |

Plaintiff Kevin Olson, a former correctional officer with the Department of Corrections and Rehabilitation (CDCR), appeals the trial court's denial of his writ of administrative mandamus challenging his dismissal from CDCR employment for misconduct.  Olson contends the trial court erred in finding that his testimony in the

1

administrative proceedings was not credible. He further contends the trial court erred in sustaining the administrative law judge's determination that Olson used unnecessary force against an inmate and was dishonest.

We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Olson was dismissed from his position as a correctional officer after the CDCR found he assisted a second correctional officer, Robert Kramer, in the use of unnecessary and excessive force on a disruptive inmate. The CDCR also found Olson failed to intervene or deter Kramer's use of force and failed to report the incident. Instead, Olson tried to ensure that the incident remained a secret by destroying a medical report, deceiving medical staff, making false statements during an investigative interview, and attempting to dissuade a junior correctional officer, Bobbie Williams, from reporting the misconduct during her own investigative interview.

Kramer was also dismissed. He and Olson both appealed their adverse actions to respondent State Personnel Board (the Board) and the consolidated appeals were heard by an administrative law judge (ALJ).[1]

### Administrative Hearing Testimony

On January 12, 2007, Correctional Officer Williams was among the officers working at High Desert State Prison who responded to Building A-3 after inmate Saechao assaulted a correctional officer. Saechao was taken from Building A-3 to a holding cell in Building A-5. Prison staff psychologist Dr. Virgil Crawford and counselor Dianna Fleetwood were in the area adjacent to the holding cell where the officers took Saechao.

---

[1] Kramer is not a party to this appeal.

2

Williams testified that when Kramer came into Building A-5 ahead of Saechao and his escort, she heard him tell Crawford and Fleetwood, "if you don't want to see what's going on, you should leave" or words to that effect. She then heard Fleetwood respond to Kramer, "then don't do it," or words to that effect.

Williams said Saechao was placed on the floor in front of the holding cell. Williams saw Kramer put his foot on Saechao's face. After Saechao was in the cell, he yelled and howled and called out other inmates, using racial slurs. The officers were frustrated and angry. Kramer told Saechao to "[s]hut the fuck up." Saechao also pulled down his pants and began simulating sex acts.

Williams testified that Kramer went into the holding cell to calm Saechao down because his behavior was making the other inmates disruptive. Saechao was facing the back of the cell. While in the cell, Kramer put his hand over Saechao's mouth. As Kramer was backing out of the cell, he pushed Saechao's head against the holding cell. Olson then went into the cell and used his hand to push Saechao's head up against the back of the cell. Immediately after the incident, Olson said he did not trust Fleetwood or the nurse and told Williams to "block their view if it ever happened again."

At Williams's request, a nurse completed a "7219" injury report form on Saechao shortly after he was placed in the holding cell. The report indicated Saechao had no visible injuries.[2] Williams testified that Olson later told her he was going to discard that injury report. While Williams did not know why Olson intended to discard the report, she testified that it made no sense that Saechao had no injuries at the time the report was

---

[2] The nurse who filled out the 7219 report wrote a statement in which he stated he attempted to do a visual assessment of Saechao while Saechao was in the cell yelling. Saechao was uncooperative and the nurse was not able to get close to Saechao because of his behavior. The nurse could see only Saechao's face and legs from a distance.

3

written because he had been carried and placed down several times between Building A-3 and Building A-5.

A second 7219 injury report form, prepared after Saechao was later transferred from Building A-5 to a mental health unit, showed several injuries on Saechao's body, including a lump on the right side of his forehead and a bruise a little lower on the right side of his forehead.

Williams testified about her relationship with Kramer and Olson. She said she had been trained by them, had good relationships with them, looked up to them, considered them mentors, and even went out drinking with them. Williams had only been on the job a year at the time of the incident and was uncomfortable about what she had seen and whether it constituted force. Consequently, Williams consulted another officer, who advised her to report the incident. She did, and a week after the event, Williams wrote a memorandum about the incident, which she submitted to her superiors, and which was admitted into evidence at the hearing. In the memo, Williams stated that before she was interviewed by Captain Gower about the event, Olson told her "not to bite" on the investigators' questions because they were "just fishing." Olson also reminded Williams, "we don't go inside inmates['] cells."

The testimony of Crawford and Fleetwood corroborated portions of Williams's testimony. They testified that when Saechao was brought into the building, Kramer said something like they "might not want to be there" or "might not want to see what happens" or "might want to leave. You're not going to want to see this." Kramer was frustrated and angry. The comment alarmed Crawford. Crawford said that after hearing that comment, there was "no way in the world" he and Fleetwood were going to leave. Fleetwood responded to Kramer's comment by saying something like "nothing should happen that [they] could not see" or "you shouldn't be doing it then." Fleetwood heard Kramer tell Saechao to "shut the fuck up" multiple times. Later, as Crawford passed by,

4

he saw Kramer in Saechao's cell, telling Saechao to "shut the fuck up," and saw someone, probably Kramer, with his hand over Saechao's mouth.

Olson testified on his own behalf. He testified that he and Kramer entered Saechao's holding cell only because Saechao's boxer shorts were down and they had been ordered to pull up his shorts. Olson said he placed one hand on Saechao's back and the other hand on his leg near the restraints to keep him from spinning, so that Kramer could pull up Saechao's shorts. Olson denied that he or Kramer used force against Saechao or touched Saechao's head. He denied seeing Kramer put his hand on Saechao's mouth, but also said that while he was holding Saechao, he was bent over and could not see above hip level. During his internal affairs interrogation, Olson denied that anyone had used unnecessary or excessive force against Saechao or that Kramer had cursed Saechao.

Olson explained why he threw away the first injury report. He said he reviewed the report and concluded it was incomplete. He said that after Saechao assaulted staff in Building A-3, there were 10 or 15 officers on top of him. Saechao resisted the officers, who escorted him all the way to the cell in Building A-5. An officer was injured in the process. Olson felt there was "no way" Saechao would not have "abrasions, scrape marks on the elbows, scrape marks on the knees from the leg restraints." Olson showed Medical Technician Assistant Watkins the first injury report and Watkins said it was not correct, because she had seen injuries on Saechao. Watkins contacted the mental health unit where Saechao had been taken and requested that another injury examination and report be done as soon as Saechao arrived in the unit. Olson testified that after the second report was done, Watkins told Olson to discard the original report.

Seven days after the incident, Olson was called into Captain Gower's office. Gower asked Olson whether he had anything he wanted to get off his chest and warned him that officers had been fired for not telling the truth. Gower also asked him whether he was familiar with the code of silence. Olson asked if he needed a union

5

representative, and after being denied representation, he was excused to leave. Before he left, Gower told Olson to tell Sergeant Jimenez and Williams not to leave the building because they would be called to his office. Olson testified that he then told Williams, "[y]ou need to be really careful" when interviewed by Gower and that she should ask for a union representative because he had "got hit on [the] code of silence" and was denied a union representative. Olson denied telling Williams the investigators were "simply fishing" and not to "bite on their questions," or warning her that staff do not enter cells. He said this was the only conversation he had with Williams about being interviewed. He denied knowing that Gower had been asking about the Saechao incident when questioned in Gower's office and denied any attempt to influence Williams's report to investigators.[3]

### The ALJ's Findings of Fact and Conclusions of Law

Following the administrative proceedings, the ALJ issued a proposed decision in which she found that Olson "pushed [Saechao]'s head up against the wall of the [holding] cell" and, by doing so, used unnecessary and excessive force against the inmate. The ALJ also found that Olson lied about the use of force, lied about not hearing Kramer use profanity, and credited Williams's testimony regarding what Olson told her before her interview with Captain Gower.[4] The ALJ concluded that Olson attempted to cover up

---

[3] Kramer also testified. Like Olson, he reported that he and Olson entered Saechao's cell only to pull up his underwear, did not hit Saechao, push his head against the holding cell, or otherwise use any unnecessary or excessive force against him. Kramer denied putting his hand over Saechao's mouth. Kramer admitted he was agitated during the incident, screamed profanities at Saechao, and warned Fleetwood, "you don't want to see this" only because there was a "mass of staff coming" and "they were in the way," Saechao was flailing and "staff assaultive" and Saechao was "half naked."

[4] The ALJ found that, at all times, Olson admitted discarding the initial 7219 injury report. The ALJ found his story to be "equally plausible" to the CDCR's theory that Olson had destroyed the first report to cover up evidence that Saechao was injured by him and Kramer. The ALJ included in her findings of fact that Olson discarded the

6

what had occurred, his actions reflected the improper use of force, as well as dishonesty, and his failure to accept and admit responsibility showed a strong likelihood this conduct could recur. The ALJ found that Olson had properly been dismissed.

In making her factual findings, the ALJ also made express credibility determinations. Noting in her proposed opinion that the testimony of Olson and Kramer stood "in direct contradiction to the testimony of at least two other witnesses," Williams and Crawford, the ALJ credited Williams's testimony over Olson's because Williams had "no reason to lie" and there was no evidence impugning her character, as the only "bad facts" concerning Williams were her own admissions she failed to immediately report the incident. Because Williams considered Olson a mentor, had a close relationship with him, and held him in high regard, the ALJ concluded Williams had no motive to lie against Olson. To the contrary, given her relationship, she would have been reluctant to provide negative information about him. On the other hand, Olson and Kramer had a motive to lie about using force, given that they were subject to dismissal. The ALJ found Olson's testimony that he never heard Kramer use profanity to be "far fetched" because Kramer admitted using profanity, Olson was in close proximity and Kramer's words were heard by Fleetwood, who was sitting in her office on the other side of a wall.

The ALJ also concluded that Williams's credibility was bolstered by the testimony of Crawford and Fleetwood regarding Kramer's statement they were "not going to want to see this." Williams's credibility was further supported by Crawford's testimony that he also saw Kramer with his hand over Saechao's mouth.

### The Board's Decision

The Board adopted the ALJ's factual findings and legal conclusions in their entirety, and the ALJ's proposed decision became the decision of the Board.

---

report at Watkins's direction. Olson admitted to internal affairs investigators that he knew it was wrong to discard the report, but the ALJ observed that the CDCR cited no authority or evidence as to the impropriety of this conduct.

**The Petition for Writ of Mandate**

Olson then brought the instant petition for a writ of administrative mandate. The trial court denied the petition. In its written statement of decision, the trial court noted that an agency's credibility determinations are entitled to deference, and found that Officer Williams's "neutral eye witness" [*sic*] testimony that Olson and Kramer entered the holding cell and pushed Saechao's head against the wall constituted substantial evidence to support the administrative findings.

## DISCUSSION

On appeal, Olson takes issue with the trial court's statement of decision, contending the trial court "committed prejudicial error in finding that [his] testimony was not credible." He also contends the trial court erred in "sustaining the ALJ's determination" that Olson used unnecessary force.

### I. Standard of Review

The Board must give a credibility determination by the ALJ great weight if it is based on some aspect of the demeanor, manner, or attitude of the witness which the ALJ has identified. (Gov. Code, § 11425.50, subd. (b); *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 586-589 (*California Youth Authority*).) The Board may exercise its independent judgment as to all other factual findings. (*Ibid.*) Under a grant of constitutional authority (Cal. Const., art. VII, §§ 2, 3), the Board acts in an adjudicatory capacity when it reviews disciplinary actions, "much as a trial court would in an ordinary judicial proceeding"; it "makes factual findings and exercises discretion on matters within its jurisdiction" and "[o]n review the decisions of the Board are entitled to judicial deference." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 823; accord, *California Youth Authority*, *supra*, 104 Cal.App.4th at p. 584.)

At the next level of review, the trial court reviews the decision of the Board. The court may reject the Board's factual findings if the Board failed to give sufficient weight

8

to a credibility finding by the ALJ that was supported by an identified aspect of the demeanor, manner, or attitude of the witness. (See *California Youth Authority*, *supra*, 104 Cal.App.4th at p. 588.) The trial court also may reject the Board's factual findings if they are not supported by substantial evidence; otherwise, it must accept them. (Code Civ. Proc., § 1094.5, subd. (c); *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125-1126.)

Finally, at the third level, we review the trial court's decision. We must decide, among other things, whether the trial court applied the substantial evidence standard correctly. However, we must also accept the Board's factual findings, unless either the Board used an incorrect standard of review (which is not alleged here), or its findings are not supported by substantial evidence. (*Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404; *California Youth Authority*, *supra*, 104 Cal.App.4th at p. 584.)

" 'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. [Citation.] Such evidence must be reasonable, credible, and of solid value." (*California Youth Authority*, *supra*, 104 Cal.App.4th at pp. 584-585.) "On review the decisions of [the Board] are entitled to judicial deference. The record must be viewed in a light most favorable to the decision of [the Board] and its factual findings must be upheld if they are supported by substantial evidence." (*Id*. at p. 584.) In applying the substantial evidence test to Board decisions, " '[w]e do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the board's decision. Its findings come before us "with a strong presumption as to their correctness and regularity." [Citation.] We do not substitute our own judgment if the board's decision " ' "is one which could have been made by reasonable people. . . ." [Citation.]' " ' " (*Id*. at p. 584.) However, in assessing whether substantial evidence in Board proceedings exists, we do not isolate and consider only the evidence which supports the Board's findings. " '[W]e consider all evidence presented, including that

9

which fairly detracts from the evidence supporting the Board's determination.' " (*Id*. at p. 586.)

## II. Substantial Evidence Analysis

We first note, and set straight, a misconception that appears in Olson's appellate brief. He erroneously states that the trial court found that Olson's testimony was not credible because of the ALJ's determination that it was in direct conflict with that of Williams. In fact, the trial court merely reviewed the factual findings and credibility determinations made by the ALJ and adopted by the Board. The court did not issue its own factual findings or credibility determinations.

Applying the principles we have outlined, we conclude the Board's factual findings that Olson pushed Saechao's head against the holding cell, and thereafter attempted to influence Williams to cover up the incident are supported by the testimony of Williams, and that testimony provides the requisite substantial evidence. Williams testified she saw Olson use his hand to push Saechao's head against the holding cell, and reported that Olson told her "not to bite" on the investigators' questions into the incident. Williams's testimony on these points is not inherently improbable, incredible, physically impossible, or wholly unacceptable to reasonable minds. (See *Flowers v. State Personnel Bd.* (1985) 174 Cal.App.3d 753, 759 [" 'The trier of fact's determination will be interfered with on appeal only when it appears that the witness' testimony is inherently so improbable as to be unworthy of belief' "].) Evidence from an eyewitness whom the ALJ found had no incentive to fabricate damaging testimony against Olson is such that "a reasonable mind might accept as adequate to support a conclusion." (See *California Youth Authority*, *supra*, 104 Cal.App.4th at p. 584; see *id.* at pp. 584-585.) Therefore, "substantial evidence" supports the ALJ's findings and, by extension, the Board's decision. (*Id*. at pp. 584-585.)

10

We reject Olson's suggestion that the ALJ's credibility determinations are entitled to no deference because she did not make findings regarding Williams's demeanor, as contemplated by Government Code section 11425.50.

Government Code section 11425.50, subdivision (b) requires in pertinent part: "If the factual basis for the decision includes a determination based substantially on the credibility of a witness, the statement shall identify any specific evidence of the observed demeanor, manner, or attitude of the witness that supports the determination, and on judicial review the court shall give great weight to the determination to the extent the determination identifies the observed demeanor, manner, or attitude of the witness that supports it." In *California Youth Authority*, this court held that Government Code section 11425.50 applies to credibility determinations by an administrative law judge in Board administrative adjudications of employee disciplinary actions. (*California Youth Authority*, *supra*, 104 Cal.App.4th at pp. 588, 590-592.)

As we have described, however, the ALJ credited Williams's testimony based on factors *other* than her demeanor, manner, or attitude. Under such circumstances, Government Code section 11425.50 is inapplicable. When an ALJ merely states in her decision that she believed or disbelieved certain witnesses, but does not identify any " 'observed demeanor, manner, or attitude' of witnesses," we may conclude "the ALJ based this credibility determination on inferences unrelated to witness demeanor, manner or attitude." (*California Youth Authority*, *supra*, 104 Cal.App.4th at p. 596.) Because the ALJ here did not base Williams's credibility determination regarding her testimony on her demeanor, manner, or attitude, we conclude Government Code section 11425.50 does not apply. (*California Youth Authority*, *supra*, at p. 596.)

Although the Board was not required by statute to give "great weight" to findings unaccompanied by reliance on demeanor or appearance (Gov. Code, § 11425.50, subd. (b)), we nonetheless apply the standards generally applicable to an appellate review for substantial evidence that includes credibility determinations. Review under a

11

substantial evidence standard is highly deferential to the fact finder. (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 748.) We neither substitute our own judgment if the Board's decision is one which could have been made by reasonable people (*Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701), nor reweigh the evidence presented to the Board (*ibid.*); rather, we defer to the determination of credibility by the finder of fact (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065). Here, the finder of fact found Williams credible and, by comparison, the opposing evidence offered by Olson less than credible. Because that decision is not inherently unreasonable, we shall not upset it on appeal.[5]

Olson contends the ALJ's credibility determinations as to Williams's testimony were not supported by the evidence. He cites testimony that assertedly conflicts with Williams's testimony. Olson points out that two escorting officers, and Crawford and Fleetwood, testified they did not see Kramer put his foot on Saechao's face before Saechao was placed in the cell.

---

[5] We find Olson's reliance on *In re Lyle Q. Guidry* (1995) SPB Precedential Decision No. 95-09 to be misplaced. Olson cites *Guidry* for the proposition that the Board historically has "rejected the uncorroborated testimony of one witness to sustain allegations of misconduct." Olson reads too much into *Guidry*. In *Guidry*, the Board recognized that the uncorroborated testimony of one witness may be sufficient evidence to support the allegations contained in an adverse action. (*Id.* at p. 10.) However, in that case, the Board determined that the uncorroborated testimony of the single witness was insufficient because that witness lacked the "ability to perceive and recall the most basic facts" (*id.* at p. 9) and the Board had "grave reservations" about dismissing Guidry based on the testimony of a witness who had difficulty "relating the basic details of what transpired during the incident" (*id.* at pp. 9, 10-11). Under those circumstances, the Board found the evidence insufficient to support the ALJ's findings. The quality of Williams's testimony is significantly different than that of the witness in *Guidry*. Moreover, in this case, the Board -- which exercises its independent review of the ALJ's findings -- accepted and adopted those findings as its own. Thus, *Guidry* is of no help to Olson.

As for Crawford and Fleetwood, we note that the evidence indicates they could easily have missed that event. When asked whether he saw somebody put a foot to Saechao's head, Crawford testified, "there was [*sic*] a lot of people there and there was [*sic*] a lot of people around him and I ended up more on [*sic*] the back of the group. And I . . . don't think I saw everything." Fleetwood testified that she saw the officers place Saechao on the floor outside the cell, but did not see any officer place a foot to his head. But Fleetwood also testified that, although she was not watching when Saechao was placed in the cell, she thought Kramer put Saechao in the cell because he had been standing there immediately before and after she noticed Saechao in the cell. She said she did not watch the movements between the time Saechao was on the ground and the time she saw him in the cell.

One of the officers, Officer Davidge, testified that he was standing a foot away from Saechao's head after he was placed on the floor. He said he could have missed someone putting a foot on Saechao's head at that time if he had been distracted, but he did not feel he had been. He testified that nobody put a foot on Saechao's head. The other officer present, Officer DeLong, was asked whether he saw Kramer "putting his boots on the inmate[]" and whether he saw "any officer putting his leg on the inmate's head," to which he replied "No sir."

Olson points out that contrary to Williams's testimony that it was Kramer who put Saechao in the cell, Davidge testified that it was he and Sergeant Jimenez who put Saechao in the cell. DeLong testified that he was positive Kramer was not present when Saechao was placed in the cell. He also said Olson was not present at that time. But DeLong also testified he had no recollection regarding which officers were present. DeLong was not asked where he was standing relative to Saechao or the other officers who were present. Nor was he asked about where his attention was focused. Crawford testified that there were 15 to 20 people around Saechao when he was placed in the cell.

13

Olson also points out that the aforementioned witnesses did not see Olson push Saechao's head against the cell. Again, the record reveals the witnesses may not have been in a position to see this event, or their attention was not focused on it. Fleetwood testified she did not have a clear view of the cell from her office. She would not have been able to see officers enter the cell from her position at her desk. To see the cell she would have to "slide all the way down" her desk, and she was occupied with her work after Saechao was placed in the cell. Moreover, Fleetwood testified she was not in her office the entire time Saechao was in the building. Crawford testified that after he saw Kramer in the cell and "a hand on Saechao's mouth," Crawford "walked over to the medical" to call about the availability of a bed for Saechao at the crisis bed unit. Davidge testified that he left Building A-5 after Saechao was placed in the cell and had no knowledge of what had occurred after he left. Similarly, DeLong testified that he left the building about five minutes after Saechao was placed in the cell. He had no information about what occurred thereafter.

Thus, as to Williams's observation of Kramer and Olson pushing Saechao's head against the cell, the only testimony that conflicts with her testimony is that of Kramer and Olson, two interested parties. (Evid. Code, § 780, subd. (f) [in deciding the credibility of a witness, the trier of fact is entitled to consider whether the witness has a "bias, interest, or other motive"].) Moreover, we note that Saechao sustained a lump to his forehead that seems consistent with Williams's assertion that his head was pushed against the cell and inconsistent with Olson's expectation that Saechao would have sustained abrasions and scrapes while resisting during the escort from Building A-3.

Finally, no witnesses other than Olson provided testimony that contradicts Williams's testimony about what Olson said to her before she was called to Captain Gower's office. That evidence supports the finding that Olson attempted to influence what Williams would tell Captain Gower. It also evinces a consciousness of guilt. (Evid. Code, § 413; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1138-1139.)

14

Having considered all the evidence presented, including that which fairly detracts from the evidence supporting the Board's determination (*California Youth Authority*, *supra*, 104 Cal.App.4th at p. 586), we conclude there was substantial evidence supporting the Board's findings notwithstanding the inconsistencies highlighted by Olson.

## DISPOSITION

The judgment is affirmed. The Board is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278 (a)(1), (2).)

                                                   _____ MURRAY _____, J.

We concur:


_____ BLEASE _____, Acting P. J.


_____ ROBIE _____, J.

15